**Richard M. NIXON, Plaintiff,**

v.

**ADMINISTRATOR OF GENERAL SERVICES et al., Defendants,**

and

**The Reporters Committee For Freedom of the Press, et al., Intervenor-Defendants.**

**Civ. A. No. 74–1852.**

United States District Court, District of Columbia.

Jan. 7, 1976.
As Amended April 1, 1976.

See also 168 U.S.App.D.C. 169, 513 F.2d 427.

Herbert J. Miller, Jr., Raymond G. Larroca, Martin D. Minsker, William H. Jeffress, Jr., R. Stan Mortenson, Washington, D. C., for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Irwin Goldbloom, Deputy Asst. Atty. Gen., David J. Anderson, Jeffrey F. Axelrad, John T. Boese, Dept. of Justice, Washington, D. C., for defendants.

Robert E. Herzstein, Andrew S. Krulwich, Mark J. Spooner, Simon Lazarus, III, Peter T. Grossi, Jr., Leonard B. Simon, Washington, D. C., for Reporters Committee for Freedom of the Press, and others.

William A. Dobrovir, Andra N. Oakes, Washington, D. C., for Jack Anderson.

Leon Friedman, Hempstead, N. Y., and John H. F. Shattuck, Melvin L. Wulf, American Civil Liberties Union, New York City, for Lillian Hellman, and others.

328

Before McGOWAN and TAMM, Circuit Judges, and ROBINSON, District Judge.

## OPINION

McGOWAN, Circuit Judge:

On December 20, 1974, plaintiff filed this suit, alleging that the Presidential Recordings and Materials Preservation Act, Pub.L. 93–526 (Dec. 19, 1974), 88 Stat. 1695, 44 U.S.C.A. §§ 2107 note, 3315–24 (Supp. I, Feb. 1975), [hereinafter "the Act"] is unconstitutional and seeking injunctive and declaratory relief. Jurisdiction was premised on section 105(a) of the Act, which grants the United States District Court for the District of Columbia exclusive jurisdiction to hear challenges to the constitutional validity of the Act. A three-judge district court was, on plaintiff's motion, eventually convened pursuant to 28 U.S.C. §§ 2282, 2284 (1970), as the action sought on constitutional grounds to enjoin the enforcement of a federal statute. Plaintiff alleges that the Act infringes the powers of the President; invades his presidential privilege; infringes his constitutional rights of privacy, free speech, and free association; is an unconstitutional search and seizure; denies him equal protection of the laws; and is an unconstitutional bill of pains and penalties. For the reasons appearing below, we hold that there is no constitutional

defect apparent from the face of the Act requiring us to enjoin its operation.

## I. BACKGROUND

Plaintiff was, of course, the President of the United States from January 20, 1969 to August 9, 1974. He resigned on the latter date, less than two weeks after the House Judiciary Committee had voted to recommend his impeachment. H.R.Rep. No. 93–1305, 93d Cong., 2d Sess., at 10–11 (1974). When he left office, Mr. Nixon had no intention of permanently leaving the materials accumulated during his administration[1] in the

1. To understand what materials are at issue in this case it is important to understand the filing system employed in the White House. The basic filing unit is the Central Files, in which copies of a wide variety of records are maintained according to subject. Included therein are incoming and outgoing correspondence of the President and his staff, reports, memoranda, and various other documents. Members of the White House staff are supposed to send virtually all papers (or copies thereof) relating to their official functions to this filing unit, which serves as the basic reference system for presidential papers. See Affidavit of William F. Matthews at 1–2, exhs. A, B, E [hereinafter "Matthews Affidavit"].

A few sections of the Executive Office of the President (a so-called umbrella agency)—for example, the Domestic Council and the Council on International Economic Policy—interfile papers with the Central Files. Id. at 2; Deposition of Jack Nesbitt in Nixon v. Sampson, 389 F.Supp. 107 (D.D.C.1975), at 15 [hereinafter "Nesbitt Deposition"]. On the whole, however, component parts of the Executive Office—including the Office of Management and Budget, the Office of Telecommunications Policy, the Council of Economic Advisors, and the Council on Environmental Quality—maintain separate files. Nesbitt Deposition at 15, 19; Matthews Affidavit at 2; Affidavit of William J. Hopkins at 2 [hereinafter "Hopkins Affidavit"]. The National Security Council maintains a set of institutional files relating to the internal decisionmaking and policymaking processes of the Council. It also maintains "noninstitutional" files, which include

> records of negotiations with foreign governments, correspondence with foreign heads of state and government, correspondence—including presidential directives—with agencies in the Executive Branch on matters concerning foreign affairs but not considered part of the NSC institutional process
> . . . . .

Affidavit of Jeanne W. Davis at 3. Included within the Central Files, however, are materials sent from departments or agencies of the Executive Branch—including the Executive Office of the President—to the President or his staff. Matthews Affidavit at 2.

During the last three years of Mr. Nixon's presidency, a subsection of the Central Files, known as the Special Files, was established for various kinds of sensitive material. Affidavit of Gertrude Fry at 1–3. This was an innovation and the practice has since been discontinued. Id. Another subsection of the Central Files, of less recent origin and continuing use, is the Precedent File. This file collects on a less than systematic basis materials dealing with unusual subjects that might provide useful precedents were similar situations to arise—for example, materials relating to how the configuration of the American flag was changed when Hawaii and Alaska were admitted to the Union. Matthews Affidavit at 2; Hopkins Affidavit at 6–7.

Outside of the Central Files, there are three other principal places where records are kept. First, the Records Office in the White House maintains a Card File which records only the fact that certain actions were taken by the White House. For example, were a President to veto a bill, the fact that such action was taken would be recorded in the Central Files; the official document transmitting the veto would be sent to Congress; and any underlying material relating to the formulation of the veto decision and message would be sent to the Central Files. Hopkins Affidavit at 5. Second, the Administrative Office of the White House maintains files relating to personnel, purchases, and accounts. Id. at 6. Third, each staff member may retain individual files relating to his own activity, and the President may maintain a personal file; but, as noted above, the originals or copies of materials in staff files are supposed to be sent to the Central Files.

Plaintiff claims the right to dispose of the tape recordings made during the Nixon presidency and all the materials for the same period described above, except: (1) the Card File in the Records Office; (2) the Precedent File of the Central Files; (3) the separate files of component parts of the Executive Office of the President (including the National Security Council institutional files); (4) the files of the Administrative Office; and (5) materials in the files of individual staff members of which there is no duplicate in the Central Files and which were not gathered by archivists who, shortly after Mr. Nixon's resignation, attempted to accumulate from staff members all nonpersonal materials, see p. 355 infra. Plaintiff's Brief at 9–24.

White House, Affidavit of Richard Nixon at 2 [hereinafter "Nixon Affidavit"], and immediately after his resignation government archivists began to collect these materials and box them for shipment to California. Deposition of Jack Nesbitt in *Nixon v. Sampson*, 389 F.Supp. 107 (D.D.C.1975), at 38–43.[2]

Shipment was halted by the new administration after the Watergate Special Prosecutor informed the White House of his continuing need for the materials. Deposition of Benton L. Becker in *Nixon v. Sampson, supra*, at 6–11 [hereinafter "Becker Deposition"]; Affidavit of Peter M. Kreindler in Support of Motion of Leon Jaworski, Special Prosecutor, to Intervene in *Nixon v. Sampson, supra*, Oct. 21, 1974, at 2–3; Deposition of Philip W. Buchen in *Nixon v. Sampson, supra*, Vol. I, at 4–7, Vol. II, at 10–11, 73–74 [hereinafter "Buchen Deposition"]. While the materials remained at the White House, Philip W. Buchen, Counsel to President Ford, solicited and received from the Justice Department a preliminary opinion that the materials were plaintiff's private property. Buchen Deposition Vol. I, at 7, 11–12.[3] At or around the same time, negotiations about them between the White House and Mr. Nixon's attorney commenced. Buchen Deposition Vol. I, at 14–15, Vol. 2, at 36–48, exhs. 4, 5; Becker Deposition at 28–29, 35. These negotiations culminated in an agreement whose terms were elaborated in a letter from plaintiff to Arthur F. Sampson, Administrator, General Services Administration (GSA), dated September 6, 1974 and which was accepted by Sampson the next day. Deposition of Arthur F. Sampson in *Nixon v. Sampson, supra*, exh. 1; Buchen Deposition Vol. 2, at 36–48; Becker Deposition at 50–51, 103.

In its most important features, the Nixon-Sampson agreement provides that all "presidential historical materials"[4] accumulated during the Nixon presidency were to be placed under deposit pursuant to the Federal Records Act, 44 U.S.C. §§ 2101 *et seq.* (1970), and transferred to the Administrator of GSA, under whose custody they would be shipped at Government expense to a Government facility in California near Mr. Nixon's residence. For a period of three years or, in the case of tape recordings, five years, access to the materials would be limited to Mr. Nixon or persons authorized by him, although access required two keys, one in Mr. Nixon's and one in GSA's possession. No original materials could be withdrawn during this initial stage, but Mr. Nixon could reproduce any document and, with the agreement of GSA, any tape recording. If any materials under deposit were sought by legal process, Mr. Nixon was to receive immediate notification to enable him to assert any rights or privileges he might have, and he agreed to afford the United States the same opportunity. After the three-year period had expired, Mr. Nixon could withdraw from deposit any documentary materials he wished and dispose of them as he saw fit. As of September 1, 1979, Mr. Nixon made a gift to the United States of the tape recordings, subject to the conditions that he could direct destruction of such tapes as he wished and that all of them were to be destroyed if Mr. Nixon died and in any event not later than September 1, 1984.[5]

After implementation of this agreement had been delayed at the instance of the Special Prosecutor and negotiations between the Special Prosecutor and plaintiff's attorney reached an impasse, plaintiff filed suit in the district court.

---

**2.** Although no evidentiary hearing was held by this court, various depositions, testimony, affidavits, and other evidentiary materials are in the record on the basis of stipulations by the parties.

**3.** This opinion was subsequently confirmed officially by the Attorney General. *See* 43 Op. Att'y Gen. No. 1 (Sept. 6, 1974).

**4.** *See* note 6 *infra*.

**5.** The agreement is reprinted as an appendix to both the Senate and House of Representatives committee reports. *See* S.Rep. No. 93–1181, 93d Cong., 2d Sess. (1974); H.R.Rep. No. 93–1507, 93d Cong., 2d Sess. (1974).

*Nixon v. Sampson, supra.* That action, brought on October 17, 1974, named Sampson, Buchen, and H. Stuart Knight, Director of the Secret Service, as defendants, and sought to enforce compliance with the terms of the Nixon-Sampson agreement. Shortly thereafter, two groups of plaintiffs (both of which are intervenor-defendants in the case at bar) brought suit seeking to have the materials declared the property of the United States Government, to enjoin their transfer to Mr. Nixon, and to gain access to them under the Freedom of Information Act, 5 U.S.C. § 552 (1970). In one such action, *Hellman v. Sampson,* Civil No. 74–1551 (D.D.C., filed Oct. 24, 1974), Mr. Nixon was named as a defendant along with government officials; in the other, *Reporters Committee for Freedom of the Press v. Sampson,* Civil No. 74–1533 (D.D.C., filed Oct. 21, 1974), he was subsequently permitted to intervene, *Nixon v. Sampson, supra,* at 118. Ultimately, these two actions were consolidated with the suit brought by Mr. Nixon, and both the Special Prosecutor and Jack Anderson, a newspaper columnist, were permitted to intervene in Mr. Nixon's suit, the former as a defendant and the latter as a plaintiff. *See id.* at 114, 117–18.

Before that litigation had been filed, Congress had commenced consideration of legislation dealing with the disposition of presidential papers. After enactment by Congress, the Act was signed into law by President Ford on December 19, 1974. The Act, which supersedes the Nixon-Sampson agreement, directs GSA to obtain possession of (1) all tape recordings of conversations recorded by any federal official which involve Mr. Nixon or any other employee of the Federal Government and were recorded, during the time Mr. Nixon was President, in the White House or other offices used by Mr. Nixon (section 101(a)); and (2) all "Presidential historical materials" for the same period (section 101(b)).[6] All items in the custody of GSA are to be available to legal process, subject to any rights, defenses or privileges invoked by the Government or any individual (section 102(b)); to Mr. Nixon or his designee (section 102(c));[7] and to any agency or department of the Federal Government for lawful Government use (section 102(d)).[8]

Under section 104(a) of the Act, the Administrator is directed to promulgate regulations governing public access to the materials covered by section 101, taking into account the following seven factors:

(1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term "Watergate";

(2) the need to make such recordings and materials available for use in judicial proceedings;

(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;

(4) the need to protect every individual's right to a fair and impartial trial;

6. Section 101(b)(2) incorporates by reference the definition of "historical materials" given in 44 U.S.C. § 2101 (1970), which reads in relevant part:

"historical materials" including [sic] books, correspondence, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, motion pictures, sound recordings, and other objects or materials having historical or commemorative value.

7. Although neither the Act nor the regulations promulgated pursuant to § 103 of the Act, *see* note 8 *infra,* explicitly grant Mr. Nixon the right to reproduce any materials, § 102(c) provides that he shall have access "for any purpose which is consistent with the provisions of this title, subsequent and subject to the regulations which the Administrator shall issue pursuant to section 103." All counsel at the oral argument on the merits appeared to agree that plaintiff would be able to reproduce the materials retained in government custody.

8. Section 103 of the Act merely directs the Administrator to issue regulations to assure preservation of the materials in custody and to prevent unauthorized access to them. Such regulations have been promulgated. *See* 40 Fed.Reg. 2669 (1975), *to be codified as* 41 C.F.R. §§ 105–63.101–.303.

(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;

(6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and

(7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

The regulations must be submitted to Congress, either House of which has ninety legislative days to disapprove them before they take effect (section 104(b)(1))—a power the Senate exercised with respect to the initial set of regulations drafted by GSA. 121 Cong.Rec. S 15803–08 (daily ed. Sept. 11, 1975). Thereafter, on October 15, 1975, GSA submitted a revised set of regulations to Congress. As of this date, however, no regulations have yet taken effect.

Section 105 of the Act grants exclusive jurisdiction to the District Court to hear a variety of actions involving the Act, regulations promulgated thereunder, or materials covered by section 101 (subsection 105(a)); [9] contains a standard separability clause (subsection 105(b)); and au-thorizes payment of funds to any individual who is found to have been deprived by the Act of private property without compensation (subsection 105(c)).

Title II of the Act establishes a National Study Commission on Records and Documents of Federal Officials, composed of members of Congress, the Executive, the Judiciary, and private citizens from the archival and learned professions. 44 U.S.C.A. § 3318 (Supp. I, Feb. 1975). The Commission's mandate is to study problems and questions relating to the disposition and preservation of records and documents produced by federal officials, with a view toward appropriate legislative recommendations. *Id.* § 3317. Although the Commission's report to the President and Congress is to be submitted by March 31, 1976, *id.* § 3322, as of December 10, 1975, not all of the members had yet been appointed, and the first meeting was not scheduled until December 15, 1975.

On December 20, 1974—one day after the Act was passed—Mr. Nixon filed a second action, the one now before us, against the Administrator of GSA and the United States, challenging the constitutionality of the Act, together with a request for convention of a three-judge court, which request, after some delay, was ultimately granted. *See Nixon v. Richey,* 513 F.2d 427 (D.C. Cir. 1975) (per curiam), *motion for reconsideration granted,* 513 F.2d 430 (D.C. Cir. 1975) (per curiam).[10] This court, by an order

---

**9.** Section 105(a) provides:

The United States District Court for the District of Columbia shall have exclusive jurisdiction to hear challenges to the legal or constitutional validity of this title or of any regulation issued under the authority granted by this title, and any action or proceeding involving the question of title, ownership, custody, possession, or control of any tape recording or material referred to in section 101 or involving payment of any just compensation which may be due in connection therewith. Any such challenge shall be treated by the court as a matter requiring immediate consideration and resolution, and such challenge shall have priority on the docket of such court over other cases.

**10.** *Nixon v. Richey, supra,* also stayed further proceedings in the consolidated cases—in which an opinion has been issued, *see Nixon v. Sampson, supra,* but no judgment entered—in order to permit this action to proceed with priority in accordance with the mandate of § 105(a) of the Act, *see* note 9 *supra.* The Court of Appeals' opinion indicates the reasons that favor according priority to this action. 513 F.2d at 437–48. It also states that it will dissolve the stay whenever this court indicates that, in its view, the need for it no longer exists. *Id.* at 448. Following a hearing on this issue, we indicated in our order of May 1, 1975 that we concur in the discernible suggestion of *Nixon v. Richey* that the central purpose of Congress, in relation to all pending litigation, is to have an early and prior determination of

dated May 1, 1975, granted a motion by the Special Prosecutor to intervene, although he subsequently moved for and was granted leave to withdraw.[11] That order also permitted the other litigants in the consolidated cases who were not named parties in the instant case—Lillian Hellman, *et al.*, Reporters Committee for the Freedom of the Press, *et al.*, and Jack Anderson—to proceed in this case as intervenor-defendants on a joint basis. It also noted our view that nothing in section 105(a), or the meager legislative history dealing with this provision, suggests that it was meant to override or negate the provisions of 28 U.S.C. §§ 2282, 2284 (1970), calling for conven-

tion of a three-judge court. *See Nixon v. Richey, supra,* at 441–42.

The order also declined to consider separately plaintiff's motion for a preliminary injunction, instead deferring that question and combining it with a decision on the merits. We now turn to that decision.

## II. THE SCOPE OF INQUIRY

■ Before examining the various constitutional issues, we emphasize that the question before us is a narrow one: Is the regulatory scheme enacted by Congress unconstitutional without reference to the content of any conceivable

---

the Act's constitutionality, and that we therefore had no disposition to request dissolution of the stay. Having now entered judgment in this action, we are simultaneously requesting the Court of Appeals to dissolve the stay, thus permitting the consolidated cases to proceed in whatever manner seems fit in light of the possibility of appeals in this action, *see generally* 1B J. Moore, Federal Practice ¶ 0.416[1–4] (1974), and cases cited.

At present, there remain outstanding four orders issued in *Nixon v. Sampson* granting, or modifying the grant of, temporary injunctive relief. *See* Order of October 21, 1974; Supplemental Order of October 22, 1974; Order of October 31, 1974; Order of November 7, 1974. Their net effect is as follows:

1) to enjoin the government defendants from effectuating the Nixon-Sampson agreement;
2) to enjoin the government defendants from disclosing, transferring, disposing of, or otherwise making known the presidential materials in custody, except as specifically provided;
3) to permit production of materials pursuant to subpoena, discovery demand, or court order in any civil or criminal case, at the behest of a grand jury, or at the behest of the Special Prosecutor;
4) to provide Mr. Nixon with access to the materials for the sole purpose of preparing to testify in the Watergate trial or determining whether to raise any privileges or defenses in opposition to demands or subpoenas for materials;
5) to permit use of the materials for current government business upon prior notification to counsel for Mr. Nixon and with the consent of Philip W. Buchen;
6) to grant any past or present member of the White House Staff, any defendant in the Watergate criminal trial, or the Special Pros-

ecutor access to materials under the following procedures:
a) a request shall be made to Philip W. Buchen, who shall advise counsel to Mr. Nixon, the court, and the Special Prosecutor of the request;
b) upon receiving the consent of counsel to Mr. Nixon, said person shall be granted access to his/her files for the purpose of taking notes;
c) in the event it is desired to reproduce materials, notice shall be served upon counsel to Mr. Nixon, Mr. Buchen, the Special Prosecutor, and the court;
d) counsel for Mr. Nixon or Mr. Buchen shall give or withhold consent to reproduction of materials, and if consent is withheld, copies shall not be made;
e) any search for materials shall be conducted jointly by Mr. Buchen and counsel to Mr. Nixon, or his designated agent.

11. The Special Prosecutor's Motion for leave to withdraw, filed on September 8, 1975, stated that he had received or listened to all tape recordings that were arguably relevant to specified investigations, and had examined all files likely to contain documents pertinent to ongoing investigations and had obtained all such documents contained therein. These materials had been obtained under procedures agreed to by the Special Prosecutor and counsel for Mr. Nixon, *see* note 10 *supra,* who assured the Special Prosecutor that such procedures would remain in effect. In light of that assurance, the existence of subpoena power for use by the Special Prosecutor if necessary, and the representation by the United States of all positions the Special Prosecutor would have taken in this litigation, the Special Prosecutor believed his continuing participation to be unnecessary. We agreed, and on September 17, 1975, granted his motion.

set of regulations falling within the scope of the Administrator's authority under section 104(a)? Our obligation to restrict our review to the question of the Act's facial validity *vel non* derives from two sources. First, as a three-judge district court, our jurisdiction is invoked because of the need to adjudicate the availability of injunctive relief against enforcement of a statute on constitutional grounds. The Supreme Court has traditionally taken a "constrictive view" of this jurisdiction. *E. g., Hagans v. Lavine*, 415 U.S. 528, 543–45, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Mitchell v. Donovan*, 398 U.S. 427, 431, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970) (per curiam); *Phillips v. United States*, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800 (1941). We have already indicated in our order of May 1, 1975 that we would restrict our review accordingly to consideration of the propriety of injunctive relief against the alleged facial unconstitutionality of the statute.

■ Second, we are under the prudential duty to rule on the constitutionality of congressional legislation only where absolutely necessary, *e. g., Rosenberg v. Fleuti*, 374 U.S. 449, 451, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); *Harmon v. Brucker*, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) (per curiam); *Powell v. Washington Metropolitan Area Transit Comm'n*, 151 U.S.App.D.C. 295, 466 F.2d 466, 468 (1972) (per curiam); to formulate a rule of law no broader than is necessary to decide the case before us, *e. g., Garner v. Louisiana*, 368 U.S. 157, 163, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); to seek a statutory construction that avoids constitutional difficulties, *e. g., Johnson v. Robison*, 415 U.S. 361, 366–67, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *United States v. Witkovich*, 353 U.S. 194, 201–02, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957); *Buckley v. Valeo*, 519 F.2d 821, 874 (D.C. Cir. 1975) (per curiam) (en banc), *prob. juris. noted,*

—— U.S. ——, 96 S.Ct. 32, 46 L.Ed.2d 36 (1975); and to refrain from ruling on speculative questions based upon purely hypothetical fact situations that may never come to pass, *e. g., Thorpe v. Housing Authority*, 393 U.S. 268, 283–84, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *United States v. Raines*, 362 U.S. 17, 20–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *Langston v. Johnson*, 156 U.S.App.D.C. 5, 478 F.2d 915, 917 (1973).

The principal policies that underlie these concerns—the aid to constitutional adjudication provided by a concrete set of facts and adversary presentation of argument directed to those facts, and the need to limit exercise of the delicate power of judicial review to cases inescapably calling into question the constitutionality of a statute—are peculiarly relevant to the legislative scheme before us. The Act in terms merely directs GSA to take custody of the materials that fall within the scope of section 101, and to promulgate regulations after taking into consideration the seven factors listed in section 104(a).[12] Those factors provide broad latitude to the Administrator in establishing the processes and standards under which the materials will be reviewed and public access to them afforded. With respect to constitutional challenges levelled against the Act by plaintiff, subsection 104(a)(5) is especially noteworthy. That subsection directs the Administrator to take into account, *inter alia*, "the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials."

Because of the Senate's disapproval of GSA's initial proposed regulations, there are currently no regulations in effect. When regulations finally become effective, however, they could, if drafted with careful attention to the directive of subsection 104(a)(5), eliminate the basis for some of the allegations raised by Mr. Nixon that his rights will be infringed.[13]

---

**12.** One qualification of the statement in text must be made. *See* note 18 *infra*.

**13.** By its terms, § 104(a)(5) speaks to protection of any party's "opportunity to *assert* any

Objections he now presses might be mooted by regulations that protect the very rights whose infringement he now alleges; hypothetical horrors paraded before us as abstract possibilities might never come to pass under the regulations finally placed in effect. Although written in the somewhat different context of a state statute with many distinct provisions, the words of the Supreme Court in *Watson v. Buck*, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941), are apposite to the problem before us:

> No one can foresee the varying applications of these separate provisions which conceivably might be made. A law which is constitutional as applied in one manner may still contravene the Constitution as applied in another. Since all contingencies of attempted enforcement cannot be envisioned in advance of those applications, courts have in the main found it wiser to delay passing upon the constitutionality of all the separate phases of a comprehensive statute until faced with cases involving particular provisions as specifically applied to persons who claim to be injured. Passing upon the possible significance of the manifold

provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case.

*Id.* at 402, 61 S.Ct. at 967 (alternative holding); *accord, Communist Party v. SACB*, 367 U.S. 1, 71, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); *United States v. Spector*, 343 U.S. 169, 172, 72 S.Ct. 591, 96 L.Ed. 863 (1952). There is, therefore, no need and no justification for this court now to reach constitutional claims directed at the regulations and that the promulgation of regulations might eliminate, limit, or cast in a different light.

 It is not unlikely that the Administrator may find that the seven factors listed in section 104(a) do not coexist in perfect harmony, and compromise and accommodation of conflicting directives will be necessary.[14] Yet in resolving such conflicts the paramount concern will be that enunciated in subsection 104(a)(5), for it is to be assumed that Congress intended its regulatory scheme to conform to constitutional requirements. That general canon of construction, here reinforced by several distinct

---

legally or constitutionally based right or privilege which would prevent or otherwise limit public access" (emphasis supplied). It would be possible to adopt one (or both) of two niggardly readings of this provision: (1) the subsection applies only to limitations on access, rather than limitations on the screening process, *see* pp. 339–340 *infra*; or (2) the subsection applies only to the establishment of procedures by which such rights can be asserted, rather than standards that themselves seek to provide protection. Neither reading, it seems to us, is required by the language, and each appears to deny § 104(a)(5) the scope necessary to serve its purpose of permitting the Administrator to consider the constitutionality of any regulations he drafts to ensure that they do not deprive anyone of his constitutional protections. The second reading plainly, and the first reading impliedly, conflict with clear manifestations of congressional intent in the legislative record. *See* pp. 337–338 *infra*. The Proposed Regulations on Public Access, as revised, submitted to Congress on October 15, 1975 [hereinafter "Proposed Regulations"], plainly reject the second reading. *See* §§ 105–63.402–1, .402–2. Hence, we

find no reason to so constrict the meaning of § 104(a)(5).

14. Even within the intervenor-defendants, it is possible to discern important differences in their broader objectives. Jack Anderson is a journalist, as are some members of both of the groups of intervenor-defendants. Both of those groups also include historians and political scientists. The interest of journalists would seem to lie in the ability to review, report, and comment upon the materials in question with some immediacy. However, as one noted historian has remarked, the interest of members of his profession is quite different:

> The real interest of the historian is in a rich, honest and revealing record rather than in instant access; and the more he pushes for instant access, the more he will impoverish the record. . . . The certainty of immediate disclosure would have a chilling effect; and the result would be the degeneration of the research quality of documentary evidence.

Schlesinger, *Who Owns a President's Papers?*, 27 Manuscripts 178, 181 (1975).

aspects of the Act,[15] will require the Administrator to make a considered judgment about the constitutionality of any regulatory scheme he adopts, for, as the Supreme Court has recently reminded us, "[i]n the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution." *United States v. Nixon*, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974).[16]

The legislative history suggests that Congress shared this view of the Administrator's duties. Senator Javits, one of the bill's three sponsors, had the following to say about the criteria of section 104(a):

> The criteria, Mr. President, endeavor to protect due process for individuals who may be named in the papers as well as any privilege which may be involved in the papers, and of course the necessary access of the former President himself.

In short, the argument that the bill authorizes absolute unrestricted public access does not stand up in the face of the criteria and the requirement for regulations which we have inserted in the bill today.

> There will be no broad and unrestricted public access which could nullify the criteria to which I have referred.

120 Cong.Rec. S 18244 (daily ed. Oct. 3, 1974). Senator Nelson, the bill's draftsman and principal sponsor, expressed the same view:

> The sixth principal provision concerns public access to the materials. A primary purpose here is to inform the American people of the full truth concerning the Watergate scandals. However, this purpose should not override all regard for the rights of the individual to privacy and a fair trial.

*Id.* at S 18236. Senator Ervin, the third sponsor and the floor manager of the bill, was in agreement with this view.

> Nobody's rights are affected by this bill, because it provides, as far as privacy is concerned, that the regulations of the Administrator shall take into account . . . the opportunity to assert any legally or constitutionally

---

**15.** There are a number of indications of congressional concern that this Act operate within constitutional bounds. In addition to the standard separability clause in subsection 105(b), these include (1) the express reservation in subsection 102(b) of the opportunity of any party to raise constitutional rights, privileges or defenses in resisting any legal process directed to the materials; (2) the reservation in subsection 102(c) of plaintiff's right of access to the materials; (3) the directive in subsection 104(a)(4) to consider the need to protect the right to a free and impartial trial; (4) subsection 104(a)(5), as has been discussed in text; and (5) the provision under subsection 105(c) of funds, if necessary, to compensate any individual found to have been deprived of private property.

**16.** In his Reply Brief at 69 n. 42, plaintiff raises for the first time the argument that one of the seven factors included in § 104(a)—specifically § 104(a)(1)—has underlying it the impermissible purpose of disclosure to the public of information concerning government processes. As a result, plaintiff asserts, any regulations resulting from consideration of that factor are constitutionally defective regardless of their substance. However, we find no reason to find that disclosure of information to the public is an improper purpose. It is one, to be sure, that may at some point collide with various constitutional protections, involving privacy or confidentiality, but that is not an indication that it is *per se* impermissible, as plaintiff himself concedes elsewhere, *see* Reply Brief at 16–17. *See also* note 46 *infra*. Indeed, this purpose has been identified in numerous cases as the principal objective of the Freedom of Information Act, 5 U.S.C. § 552 (1970), with no indication that it has any constitutional infirmity. *E. g., Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 17–18, 94 S.Ct. 1028, 39 L.Ed.2d 123 and cases cited n. 17 (1974); *EPA v. Mink*, 410 U.S. 73, 79–80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *Montrose Chemical Corp. v. Train*, 160 U.S.App.D.C. 270, 491 F.2d 63, 66 (1974). Thus, the premise of impermissibility upon which this argument rests is fundamentally unsound, and that disposes of the issue without the need to consider the validity of the second part of the argument. *Cf. Palmer v. Thomson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); *compare* Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Sup.Ct.Rev. 95, *with* Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205 (1970).

based right which would prevent or otherwise limit access to the tape recordings and other materials.

*Id.* at S 18329 (daily ed. Oct. 4, 1974). *See also id.* at S 18320 (remarks of Sen. Ervin); *id.* at H 11209 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas).

Finally, in the event that a particular regulation, or an entire set of regulations, might be constitutionally defective, judicial review under Section 105(a) of the statute is available.[17] If a reviewing court were compelled to invalidate challenged regulations, alternatives more consistent with constitutional requirements could thereafter be adopted.

■ It is for compelling reasons, therefore, that we limit our inquiry in this case. In particular, we decline to reach challenges based upon the alleged infringement of plaintiff's constitutional rights or privileges caused by the possible access to materials, after they have been processed, by members of the public.[18] The imposition of restrictions on access by the public, or by anyone other than executive officials for particular purposes, for a fixed period of years, or until the death of Mr. Nixon and others participating in or the subject of communications, could eliminate the basis for plaintiff's objections to public access.[19]

**17.** Of course, Congress has interposed itself between the formulation of regulations and the possibility of judicial review of regulations that have become effective, by reserving a power in either House to disapprove within 90 legislative days regulations submitted to Congress. *See* § 104(b)(1). Moreover, it has stated that the Administrator may not issue any regulation or any change in a regulation if that regulation or change is disapproved by either House. § 104(b)(2). The validity of such a delegation by Congress to each House has never been authoritatively established, *see* Testimony of Antonin Scalia on H.R. 8231 & H.R. 3658 before the Subcomm. on Administrative Law and Governmental Relations of the House Judiciary Comm., Oct. 29, 1975; though were it thought to be unconstitutional, only § 104(b)(1), (2) would need to be invalidated. If Congress were to disapprove regulations that the Administrator believed necessary to afford adequate constitutional protections, the Administrator would find himself in a difficult dilemma. But even were he to decide that he would be obligated under § 104(b)(2) to adhere to disapproval by one House of Congress, that obligation would only delay, not defeat, the promulgation of an effective set of regulations that protects constitutional rights. For if a reviewing court were to hold that a set of regulations, whose content was due in part to exercise of the power to disapprove delegated to a single House of Congress, were constitutionally defective, the Administrator at that point would presumably be free to draft regulations more protective of constitutional rights, ignoring any activity of a single House if a court had already found such activity to render regulations unconstitutional. Thus, even were we to assume that one House of Congress already has acted, *see* 121 Cong.Rec. S 15803–08 (daily ed. Sept. 11, 1975), or will act, pursuant to a validly delegated power, to prevent the Administrator from adopting regula-

tions necessary to protect constitutional rights, that would not argue for addressing any questions other than those to which we have limited ourselves.

**18.** Subsection 102(d), provides that the materials falling within the scope of § 101 shall "at all times" be available to executive agencies or departments for "lawful Government use," an access right that is distinct from the public access to be provided under § 104(a). Broadly read, § 102(d) might be thought to authorize wholesale access by executive officials in the Federal Government for a wide range of purposes, some of which might lead, intentionally or unintentionally, to widespread circulation of materials within or without the executive branch. *See also* note 61 *infra.* We find no reason, however, to subscribe to such a reading. For all of the reasons provided in this part of the opinion, we believe that Congress must be viewed as having authorized only such access by executive officials as will not violate any of the constitutional rights or privileges of Mr. Nixon discussed below. To find otherwise would require us to strike down as invalid that subsection of the Act (though, in light of the separability clause and the lack of dependence of other aspects of the regulatory scheme on that provision, not the entire Act), a course we must eschew if possible. Because it is easy and sensible to read the words "lawful Government use" to include the notion of "Government use consistent with such law as derives from constitutional strictures," and because the legislative history does not counsel a contrary course, *see* pp. 337–338 *supra,* we endorse such a reading.

**19.** There exists a basic set of donor-imposed access restrictions that was first formulated by Herbert Hoover, *see* Affidavit of Richard A. Jacobs, exh. A, followed by Presidents Eisenhower, *see id.,* exh. F; Kennedy, *see id.,* exh. G; and Johnson, *see id.,* exh. I. Under this

Providing for the return to Mr. Nixon, pursuant to subsections 104(a)(5) and (7), of materials implicating his personal or political privacy rights could have similar effect. Because we believe such regulations fall plainly within the Administrator's authority, we find no need to adjudicate claims that such regulations could moot.[20]

What remains before us, then, is the question whether the process by which the materials will be reviewed and classified, leading to the imposition on various classes of them of whatever access restrictions are included in the regulations, is constitutional. All of the parties appear to agree that more or less comprehensive review by government archivists seems contemplated under the Act—processing much like that used to review the materials accumulated by presidential administrations, and deposited in presidential libraries, since President Franklin D. Roosevelt's time. *See* pp. 345–347 and notes 31–33 *infra.* In

considering a comprehensive review process, however, we do not overlook the possibility that procedures might be adopted which would permit some deviation from reviewing each tape recording or document on a literally word-by-word basis. Without suggesting that the Constitution requires adoption of any of the following—a question about which we express no view—we note a variety of archival practices that might be adopted—either because expressly mandated by regulation[21] or merely as a matter of course—to limit any invasion of plaintiff's constitutionally protected interests by the screening process:

1. A practice of requiring archivists to make the minimal intrusion necessary to classify material. Identification by signature, the file within which material is found, general nature (as with diaries, or dictabelts serving the same function), a cursory glance at the contents, or other means could significantly limit infringement

scheme the following materials would be restricted:
 1) materials that are security-classified;
 2) materials whose disclosure would be prejudicial to foreign affairs;
 3) materials containing statements made by or to a President in confidence;
 4) materials relating to the President's family, personal, or business affairs or to such affairs of individuals corresponding with the President;
 5) materials containing statements about individuals that might be used to embarrass or harass them or members of their families;
 6) such other materials as the President or his representative might designate as appropriate for restriction.
President Franklin Roosevelt imposed restrictions very similar to numbers 1, 2, 4, and 5, and in addition restricted (a) investigative reports on individuals, (b) applications and recommendations for positions, and (c) documents containing derogatory remarks about an individual. Affidavit of William R. Emerson, July 22, 1975, exh. B. President Truman's restrictions were like those of Hoover, Eisenhower, Kennedy, and Johnson, except that he made no provision, like number 6 above, for restriction merely at his own instance. Affidavit of Richard A. Jacobs, exh. D.
 *See also* note 52 *infra* (describing one restriction on public access contained in the Proposed Regulations).

**20.** In *Buckley v. Valeo, supra,* the Court of Appeals for this Circuit faced a not dissimilar situation, and adopted a similar approach. *See* p. 369 *infra.*

**21.** The commentary to § 105–63.401–2 of the Proposed Regulations, *supra* note 13, suggests that each individual document or tape will have to be processed "word-by-word." Were such a regulation to be placed into effect, and challenged in litigation, a court would then be forced to consider whether the phrase "word-by-word" is to be interpreted with a literalness that would preclude adherence to any of the three practices outlined in text. If it concluded that such preclusion was inescapable, it would then have to consider whether any of those practices is constitutionally required. Surely if the answer to the second inquiry appeared to be affirmative and called into question the constitutionality of the processing scheme, the court would be especially wary of adopting a literal reading of "word-by-word" that precluded following any of the three practices. But if in the final balance it found that a regulation actually in effect strictly mandated a processing scheme that did not provide adequate protection of plaintiff's constitutional rights, that would require invalidation of only a regulation rather than the Act itself.

of plaintiff's interests without undermining the effectiveness of screening by governmental personnel. Participation by Mr. Nixon in preliminary identification of material that might be processed without word-by-word review would facilitate such a procedure.[22]

2. A practice of giving Mr. Nixon some voice in the designation of the personnel who will review the materials, perhaps by selecting from a body of archivists approved by the government.

3. A practice of giving Mr. Nixon notice of all proposed classifications of materials and an opportunity to obtain administrative and judicial review of them, on constitutional or other grounds, before they are effectuated.[23]

There is, of course, no certainty that regulations restricting public access or practices narrowly tailoring the screening process will be adopted. Were we to try to anticipate all possible constitutional questions, however, we would run the risk of rendering an advisory opinion as to some questions if such regulations or practices were ultimately adopted. For that reason, and in light of the Administrator's duty to draft regulations that scrupulously protect the constitutional rights of all parties concerned, we discuss below only questions directed toward the statute on its face and aspects of the screening process that, in their broadest outlines, we believe will necessarily be included in any processing conducted under a valid set of regulations.

## III. CLAIMS RELATING TO THE SEPARATION OF POWERS

Mr. Nixon asserts two different challenges to the operation of the Act that derive from separation of powers con-

---

**22.** The Supreme Court has suggested the appropriateness of such procedures in related situations on at least two occasions involving claims by the Executive that confidential government documents are not subject to disclosure. In both cases, the Court noted the possibility that the Government might demonstrate by extrinsic evidence that certain material was privileged and that, in such cases, the material should not even be reviewed by a judge *in camera. See EPA v. Mink*, 410 U.S. 73, 92–94, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *United States v. Reynolds*, 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953). *See also* p. 364 *infra.*

**23.** The Proposed Regulations, *supra* note 13, do not expressly provide that Mr. Nixon be notified of archival decisions to open particular materials to public access, although they do expressly provide for publication in the Federal Register of other archival decisions, *see* §§ 105–63.401–2(h), .401–3. Nonetheless, we believe that the Act, the overall scheme established by the regulations, and basic notions of procedural fairness all suggest that some practice should, and in all likelihood will, be adopted by which Mr. Nixon may obtain notice of decisions to permit public access to materials.

Subsection 104(a)(5) expressly requires the Administrator to take into account "the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials." Because of the vast quantity of materials, it would be difficult for plaintiff to assert that privacy rights require restricting access to particular items when he may not recall even what items are included in the materials or be able to reconstruct their contents. It is true that subsection 102(c) of the Act gives him a right of access to the materials, but surely that access right becomes far more meaningful, insofar as it is designed to aid him in determining whether to challenge the treatment of particular items, if he has some way of knowing what items are about to be made public. Otherwise, either Mr. Nixon must have perfect recall of the materials, which is difficult to expect, or the risk must be run that he would be unable to assert his privacy rights before public access, in his view, had already violated them. Similarly, the scheme of administrative and judicial appeals, *see* § 105–63.401–4, provided in part to protect personal rights against infringement by archival decisions, is extremely difficult to employ when those decisions are unknown.

We believe, then, that Mr. Nixon's right to challenge particular archival decisions as respects his privacy interests is hardly a meaningful one without notification of decisions that might threaten those rights. We have little doubt that a workable arrangement can be devised whereby Mr. Nixon's interests are protected with no significant disruption of the review process, and we believe that the spirit of the Act and the regulations requires no less.

cerns. First, he argues broadly that the Act infringes the powers of the President and hence represents an unconstitutional invasion of the executive sphere by Congress. Second, he insists that the Act infringes his presidential privilege as recognized by the Supreme Court in *United States v. Nixon, supra.*

In asserting a broad separation of powers claim, plaintiff points to a number of decisions suggesting that the three branches of government are totally distinct and autonomous, and that the separation of powers doctrine bars actions by one branch that even indirectly impinge upon another. Plaintiff's Brief at 83–85, *citing Humphrey's Executor v. United States,* 295 U.S. 602, 629–30, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), *O'Donoghue v. United States,* 289 U.S. 516, 530, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), *and Springer v. Government of the Philippine Islands,* 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845 (1928). *See also* Plaintiff's Brief at 95–96, *quoting Myers v. United States,* 272 U.S. 52, 167, 47 S.Ct. 21, 71 L.Ed. 160 (1926). Presidential control over the disposition of presidential papers is stated to be an essential incident of the conduct of the presidency, an incident sanctioned by past practice as well as necessity. Congressional interference with such control, so it is said, unconstitutionally infringes powers reserved to the executive branch.

■ Although the view that the separation of powers mandates three mutually exclusive branches, each entirely free from interference by the others, may once have been ascendant in the Supreme Court, it is inconsistent with the earliest formulations, as well as the most recent judicial and scholarly consideration, of the doctrine. Madison in The Federalist No. 47, reviewing the origins of separation of powers doctrine, stated that "[o]n the slightest view of the British constitution we must perceive, that the legislative, executive and judiciary departments are by no means totally separate and distinct from each other." The Federalist 325 (J. Cooke ed. 1961). He continued by remarking that Montes-

quieu, the "oracle" always consulted on the subject, *id.* at 324,

did not mean that these departments ought to have no *partial agency* in, or no *controul* over the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted.

*Id.* at 325–36 (emphasis in original). Madison illustrated and supported this position by noting that in the state constitutions, "there is not a single instance in which the several departments of power have been kept absolutely separate and distinct." *Id.* at 327.

Madison's view was shared by Justice Story, who wrote:

But when we speak of a separation of the three great departments of the government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree.

I J. Story, Commentaries on the Constitution § 525 (M. Bigelow ed. 1905).

■ The view espoused in the cases upon which plaintiff relies reflects a stiffly formal and mechanistic view of government, one that does not admit of the need for flexibility in our constitutional system to respond to changed circumstances, newly perceived needs, and practical exigencies. The modern view of separation of powers rejects the metaphysical abstractions upon which Mr. Nixon would rely, and reverts instead to a more pragmatic, flexible, functional approach. It was well elaborated in Justice Jackson's concurring opinion in *Youngstown Sheet & Tube Co. v. Saw-*

yer, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952):

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

That excerpt was quoted approvingly most recently in United States v. Nixon, supra, 418 U.S. at 707, 94 S.Ct. at 3107, in which the Supreme Court reiterated that "the separate powers were not intended to operate with absolute independence." See also Youngstown Sheet & Tube Co. v. Sawyer, supra, 343 U.S. at 610, 72 S.Ct. at 897 (Frankfurter, J., concurring) ("the content of the three authorities of government is not to be derived from an abstract analysis. The areas are partly interacting, not wholly disjointed.") That position has the universal endorsement of commentators. See, e. g., 1 K. Davis, Administrative Law Treatise § 1.09 (1958); G. Gunther, Constitutional Law: Cases and Materials 400 (9th ed. 1975); L. Jaffe, Judicial Control of Administrative Action 28–30 (1965); Cox, Executive Privilege, 122 U.Pa.L.Rev. 1383, 1387–91 (1974); Ratner, Executive Privilege, Self Incrimination, and the Separation of Powers Illusion, 22 U.C.L.A.L.Rev. 92–93 (1974).

We therefore decline to embrace plaintiff's archaic view of the separation of powers as requiring three airtight departments of government. This is not to say that we do not consider the preservation of executive autonomy to be an important concomitant of a system of separated powers. Rather, given the tension between the independence and interdependence of the three branches, separation of powers questions are to be resolved by analyzing with particularity the extent to which an act by one branch prevents another from performing its assigned duties and disrupts the balance among the coordinate departments of government. To the extent such interference is perceived, the inquiry must then shift to considering whether the impact of an Act on one branch of government is justified by the need to pursue objectives whose promotion is assigned by the Constitution to a different branch. See United States v. Nixon, supra, 418 U.S. at 711–12, 94 S.Ct. 3090; Ratner, supra, at 92–95.

The only impairment of the Executive's ability to perform its duties that plaintiff alleges the Act would cause is the detrimental impact that disclosure of communications given to the President in confidence would have on the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking. The need for protection of such confidentiality, as deriving from the separation of powers, was recognized by the Supreme Court in United States v. Nixon, supra, at 708, 94 S.Ct. 3090, in the form of a qualified privilege for certain executive communications. Both the Supreme Court and the court of appeals in this circuit, however, refused to recognize an absolute privilege, id. at 705–07, 94 S.Ct. 3090; Senate Select Comm. v. Nixon, 162 U.S.App.D.C. 183, 498 F.2d 725, 729–30 (1974) (en banc); Nixon v. Sirica, 159 U.S.App.D.C. 58, 487 F.2d 700, 712–16 (1973) (en banc) (per curiam), instead analyzing with precision in each case how to accommodate the confidentiality protected by a qualified privilege to competing needs of other branches. The contrasting results of United States v. Nixon and Nixon v. Sirica, on the one hand, finding the needs of the grand jury to be paramount to the protection of executive confidentiality, and Senate Select Committee, on the other, finding that Committee's needs insufficiently compelling to justify an inroad on executive confidentiality, illustrate the need for particularized analysis rather than mechanistic formalism in resolving disputes between separate but interdependent branches.

Although Mr. Nixon denominates his claim as one of presidential rather than executive privilege, we do not assign any significance to semantic distinctions of this kind in the context of the case at bar. What we have before us is a claim

of privilege to protect the generalized interest in free and candid communication to the President in the formulation of executive policy.[24] This is the same privilege recognized in *United States v. Nixon, Nixon v. Sirica,* and *Senate Select Comm. v. Nixon.*[25] The questions we face are who can assert that privilege, how to define its scope, and how to gauge its force when compared to competing considerations.

Mr. Nixon's claim of privilege could be easily disposed of were we to hold that only an incumbent President may assert a privilege to protect presidential confidentiality, even as to communications that took place during prior administrations. Since President Ford has signed the legislation and, far from presently asserting that the processing scheme contemplated by the Act is invalid, his administration is before us defending it, the privilege protecting presidential confidentiality arguably could not be the basis for invalidating the Act.[26] That position has much to commend it. Invocation of executive privilege reflects a determination of where the public interest lies, which in turn requires full awareness and consideration of all the desiderata militating both for and against disclosure in a particular situation. The incumbent President alone is charged with the duty under the Constitution to make such a determination as part of his obligation to execute the laws, *Sun Oil Co. v. United States,* 514 F.2d 1020, 1027 (Ct.Cl.1975) (Nichols, J., concurring), and he alone has the requisite knowledge of all facets of the problem and the unique perspective necessary to such a decision. 87 Harv.L.Rev. 1557, 1565 (1974). It is for this reason that the analogous principle has been established, in both cases involving a privilege shielding the executive from the need to disclose secret information and cases involving a privilege shielding the generalized interest in executive confidentiality, that only the head of the department involved, and not his subordinates, may invoke the privilege. *See, e. g., United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 385, 463 F.2d 788, 793–94 (1971) (per curiam) (by implication); *Mitchell v. Bass,* 252 F.2d 513, 516 (8th Cir. 1958); *Overby v. United States Fidelity and Guaranty Co.,* 224 F.2d 158, 162–63 (5th Cir. 1955). Furthermore, if the incumbent is not asserting privilege, there is little chance that disclosure would obstruct the ongoing formation and implementation of executive policy. *See* Cox, *supra,* at 1410 (by implication). Similarly, the incumbent has an interest in preventing disclosure of the confidences of predecessor admin-

---

24. Plaintiff's argument suggests that "executive privilege" relates to the need to protect secret information involving military and foreign affairs and national security, and can be asserted by the incumbent alone, whereas "presidential privilege" is designed to protect the generalized interest in confidentiality of all communications relating to executive decision-making, and can be asserted only by the individual who was President at the time of the communications. Plaintiff's Brief at 117–20. This case presents no problem concerning secret information pertaining to national security, and thus, like the Supreme Court in *United States v. Nixon, supra,* 418 U.S. at 710–11, 712 & n. 19, 94 S.Ct. 3090, we express no view on the relevance to that problem of anything in this opinion. As to what plaintiff terms "presidential privilege," by calling it "presidential" rather than "executive" he in no way answers the open question as to whether a former President may assert such a privilege; seman-

tic games do not decide difficult questions. In what follows, we refer to the privilege in question interchangeably as "executive" and "presidential."

25. Thus, we have no occasion to consider the extent to which the constitutionally-based executive privilege recognized in *United States v. Nixon,* or, to the extent it is distinct, any common law privilege protecting executive confidentiality, encompasses confidential communications involving executive officials other than the President. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148–54 & n. 17, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), and cases cited.

26. The incumbent would, of course, retain the right to assert executive privilege in order to prevent public access to any materials whose disclosure he believed would undermine executive confidentiality and would not be in the public interest.

istrators when he believes the effect will be to discourage candid presentation of views by his advisors; if he fails to raise a claim of privilege, surely the risk of impairing necessary confidentiality is attenuated.

In addition, to the extent that executive privilege is designed to shield executive officials, whose energies are and must be fully devoted to the vast governmental problems which they confront, from burdensome requests for information, see United States v. Nixon, supra, 418 U.S. at 714, 94 S.Ct. at 3110, quoting United States v. Burr, 25 F.Cas. 30, 34 (No. 14,692d) (C.C.D.Va.1807) (privilege serves as a " 'guard' " furnished to the President " 'to protect him from being harassed by vexatious and unnecessary subpoenas' "); Cox, supra, at 1385; cf. Eastland v. United States Serviceman's Fund, 421 U.S. 491, 501–03, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); Dombrowski v. Eastland, 387 U.S. 82, 84–85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam), a former President is in much less need than an incumbent.[27] Finally, an incumbent President, responsible to the electorate for his actions and subject to the political restraints of a continuing readjustment with Congress, is less likely to succumb to the temptation to abuse his authority to claim privilege. See, e. g., Cox, supra, at 1430–32; Henkin, Executive Privilege: Mr. Nixon Loses but the Presidency Largely Prevails, 22 U.C. L.A.L.Rev. 40, 43 (1974); Sofaer, Book Review, 88 Harv.L.Rev. 281, 288–89, 292–94 (1974); Winter, Book Review, 83 Yale L.J. 1730, 1740–43 (1974); 87 Harv. L.Rev. 1557, 1565 (1974). Mr. Nixon's voluntary disclosure, while in office and after great pressure had been exerted, of materials which he believed to be privileged, see 10 Weekly Comp. of Pres.Docs. 449, 450–58 (May 6, 1974), indicates that the political check on an incumbent is more than academic.

Several judicial pronouncements have held or suggested that a former President may not claim executive privilege. See Sun Oil Co. v. United States, supra, at 1027 (Nichols, J., concurring); Order and Memorandum of September 24, 1975 in Halperin v. Kissinger, 401 F.Supp. 272, 274 (D.D.C., 1973), at 1–2. At least one other has taken a contrary view. See Order of March 26, 1975 in Apton v. Wilson, 506 F.2d 83 (D.D.C., filed Apr. 24, 1972) and Kuhn v. Wilson, 506 F.2d 83 (D.D.C., filed May 13, 1971) (consolidated cases).[28] We do not believe that we must align ourselves with one or the other of these views. See Sun Oil Co. v. United States, supra, at 1025. For even assuming arguendo that Mr. Nixon may, as a former President, assert executive privilege, such a claim is not as forceful as one raised by an incumbent. All of the reasons militating against per-

**27.** There is a distinct question of the President's immunity from legal process, which more directly relates to the problem of vexatious demands for information, See, e. g., Nixon v. Sirica, supra, at 708–12; G. Gunther, supra, at 457–59, 466–68; Freund, The Supreme Court, 1973 Term—Foreword: On Presidential Privilege, 88 Harv.L.Rev. 13, 19 (1974); Gunther, Judicial Hegemony and Legislative Autonomy: The Nixon Case and the Impeachment Process, 22 U.C.L.A.L.Rev. 30, 33–34 (1974). The Supreme Court in United States v. Nixon failed to keep this issue distinct from the question of the proper scope of executive privilege. See 418 U.S. at 705–07, 94 S.Ct. 3090; Gunther, supra, at 33–34; Mishkin, Great Cases and Soft Law: A Comment on United States v. Nixon, 22 U.C.L.A.L.Rev. 76, 80 (1974). In light of the special circumstances of that case, we do not draw great significance from such a merger. However, the clear holding in United States v. Nixon, supra, at 705–07, 94 S.Ct. 3090, that the President is not immune from judicial process—the same holding that the court of appeals in this circuit had earlier made in Nixon v. Sirica, supra, at 708–12—does suggest that to the extent any weight is to be given to a President's need to avoid vexations demands for information, the only pertinent doctrine now available is that of executive privilege.

**28.** The principal argument in favor of permitting a former President to retain authority to assert presidential privilege is that political partisanship might prevail over determination of the public interest were an incumbent administration alone to have the ability to assert privilege. Executive confidentiality would consequently be inadequately protected, and thus the ultimate purpose of the privilege—to encourage free and open communication by executive officials—would be undermined.

mitting a former President to assert privilege without the support of the incumbent suggest, at the least, that if he is to be allowed to do so, such a claim carries much less weight than a claim asserted by the incumbent himself.

It is this less forceful claim that we consider as the basis for Nixon's challenge to the screening process by which the estimated 42,000,000 pages of documents, *see Hearings on GSA Regulations Implementing Presidential Recordings & Materials Preservation Act before the Senate Comm. on Gov't Operations,* 94th Cong., 1st Sess. at 83 (1975) [hereinafter cited as *Senate Hearings on GSA Regulations*], 880 tape recordings, *see id.* at 89, and other materials, *see id.* at 92, falling within section 101 of the Act will be reviewed. This claim quite plainly does not attach to all of these items, as Mr. Nixon concedes. See Plaintiff's Brief at 98. He estimates that he saw no more than 200,000 of the documents involved, Nixon Deposition at 15–16, and it is uncertain to what extent the privilege protecting presidential confidentiality recognized in *United States v. Nixon* attaches to materials he never saw.[29] In any event, like all privileged communications, any communications here protected "must originate in a *confidence* that they will not be disclosed." 8 J. Wigmore, Evidence § 2285, at 527 (McNaughton rev. ed. 1961) (emphasis in original). Moreover, as *United States v. Nixon* suggests, the privilege is limited to communications "in performance of [a President's] responsibilities," 418 U.S. at 711, 94 S.Ct. 3090, "of his office," *id.* at 713, 94 S.Ct. 3090, and "in the process of shaping policies and making decisions," *id.* at 708, 94 S.Ct. at 3107. *See Nixon v. Sirica, supra,* at 717 ("in the President's performance of his official duties");

Cox, *supra,* at 1411 n. 106; *cf. Eastland v. United States Servicemen's Fund, supra,* 421 U.S. at 501, 95 S.Ct. 1813 (immunity of legislators deriving from the Speech and Debate Clause encompasses actions within the " 'sphere of legitimate legislative activity' "), and cases cited. Undoubtedly, some of the 200,000 documents Mr. Nixon himself saw, as well as many of the others and significant portions of the tape recordings, are not related to the discharge of presidential duties and hence fall outside the scope of this protection. Moreover, a strong argument can be made that as to some of the materials encompassed by the Act and related to presidential duties, prior disclosures by Mr. Nixon, *see* 10 Weekly Comp. of Pres.Docs. 997, 1008–09 (Aug. 3, 1974); 10 *id.* 449, 450–58 (May 6, 1974); H.R.Rep. No. 93–1305, 93d Cong., 2d Sess., at 191–205 (1974), constitute a waiver of any privilege, *see* 8 J. Wigmore, *supra,* §§ 2327–29; C. McCormick, Handbook of the Law of Evidence § 93 (2d ed. E. Cleary 1972); Model Code of Evidence rule 231(b) (1942); Uniform Rules of Evidence rule 510 (1974); 87 Harv.L.Rev. 1557, 1566–68 (1974), a factor that the court of appeals in this circuit believed to be relevant in judging the relative weight of the competing claims of the grand jury and the President in *Nixon v. Sirica, supra,* at 717–18.

Thus, the executive privilege issue reduces to the following: insofar as a claim of privilege by Mr. Nixon has force as to some of the materials covered by the Act, how serious an intrusion on executive confidentiality will screening by government archivists necessarily be, and do the objectives served by the Act justify that intrusion? Once the issue is properly framed in this fashion, we believe the answer to it is relatively easy.

**29.** The answer to this question would depend upon at least two distinct factors: First, the extent to which confidential executive communications not involving *presidential* decision-making are privileged, *see* note 25 *supra,* and second, whether the privilege that attaches to presidential communications extends to communications never directly received by the

President but rather channelled in a variety of ways to him or his advisors. However, since in our view there would be no constitutional infirmity in the statute even if a large proportion of the materials falling within the Act were thought to be protected by an executive privilege, we need not further consider these issues.

■ The intrusion on executive confidentiality that review of the materials by government archivists would constitute is, in our view, at most minimal. For that confidentiality is not absolute over time, but rather begins to erode after an administration leaves office.[30] Presidents and advisors are likely to write memoirs or to engage in public reminiscences disclosing communications that once were confidential. See Intervenor-Defendants' Joint Memorandum at 132–37. Indeed, Mr. Nixon, like Lyndon Johnson before him, see Affidavit of Mildred Stegall at 1–2, established a taping system precisely to aid him in preparation of his memoirs, see Nixon Deposition at 72–73, a project for which his plans were known while in office, Nes-

bitt Deposition at 10, 58–60. Every President since Herbert Hoover has deposited presidential papers in presidential libraries, see Senate Hearings on GSA Regulations at 105, 246–47; Affidavit of Daniel J. Reed at 1, an example Mr. Nixon says he intended to follow, see Nixon Affidavit at 17–18; see also Affidavit of Richard A. Jacobs at 7–8. Over time, access restrictions have been removed from most of the materials on deposit, affording members of the public access to communications that, at the time they were made, were confidential.[31] Hence, there has not been any practice of permanently preserving executive confidentiality in recent decades. On the contrary, in an era when both executive responsibilities and the quantity of presi-

**30.** In a recent English case. Lord Chief Justice Widgery was presented with an action by the Government to restrain publication of the diaries of former Cabinet Minister Richard Crossman, in order to protect the confidentiality of communications involving Cabinet Ministers. In deciding against the Government and in favor of publication, the Lord Chief Justice indicated that, in his view, the need for protection of such confidentiality diminishes over time:

> It may be that in the short run (for example, over a period of weeks or months) the public interest is equally compelling [as in cases involving national security] to maintain joint Cabinet responsibility and the protection of advice given by Civil Servants, but I would not accept without close investigation that such matters must, as a matter of course, retain protection after a period of years.

> • • • • •

> There must, however, be a limit in time after which the confidential character of the information, and the duty of the court to restrain publication, will lapse.

> • • • • •

> The court should intervene only in the clearest of cases where the continuing confidentiality of the material can be demonstrated.

*Attorney General v. Jonathan Cape Ltd.*, (Q.B. Oct. 1, 1975), reported in London Times, Oct. 2, 1975, at 8, col. 1. The British Government has announced that no appeal will be taken. New York Times, Oct. 10, 1975, at 2, col. 4.

Mr. Nixon could be thought to agree with this view in its broadest form, for he indicated in his deposition that he believed that the 50-year restriction that President Johnson imposed upon access to the tape recordings he made while in office, see Affidavit of Mildred Stegall at 2, was "too long." Nixon Deposition at 53–54.

It is also interesting to note that Franklin D. Roosevelt, while indicating that some restrictions on public access might stay in effect as long as 50 years, stated that restrictions of an average length of 10-15 years should suffice. Affidavit of William R. Emerson, July 22, 1975, exh. A.

**31.** In the Hoover Library, there are no restrictions on presidential papers, although some restrictions exist with respect to personal and private material. Letter of July 17, 1975 from Thomas T. Thalken, Director of the Hoover Library, to R. Stan Mortenson, at 1. In the Roosevelt Library, less than 0.5% of the materials are restricted. Affidavit of William R. Emerson, July 23, 1975, at 2. There is no evidence in the record as to the percentage of materials currently under restriction in the Truman or Eisenhower Libraries. In the Kennedy Library, 85% of the material has been processed, and of the processed materials, only 0.6% is under donor (as distinguished from security-related) restriction. Letter of August 12, 1975 from David J. Anderson to R. Stan Mortenson, at 3. In the Johnson Library, review of nonclassified material for Johnson's presidential period has been virtually completed, and more than 99% of all non-security classified materials are unrestricted. Affidavit of Harry J. Middleton at 3.

In each of the presidential libraries, provision has been made for the removal of restrictions when the passage of time has eliminated the circumstances originally thought to require imposition of restrictions. See Affidavit of Richard A. Jacobs, exhs. A, D, F, H, I; Affidavit of William R. Emerson, July 22, 1975, exh. B; Affidavit of William R. Emerson, July 23, 1975, at 2.

dential papers were increasing,[32] every President since the establishment in 1934 of the National Archives (and Herbert Hoover as well) has turned over presidential papers for governmental preservation and eventual disclosure.

Perhaps most important, the screening process uniformly employed in these libraries—and therefore the practice that present executive officials would likely expect—involves comprehensive review by archivists of the materials on deposit, including those upon which access restrictions are ultimately imposed.[33] We would have trouble under any circumstances finding that mere screening by archivists, whose record for discretion in handling confidential material is unblemished, e. g., Affidavit of William R. Emerson, July 23, 1975, at 2–3; Affidavit of Harry J. Middleton at 2; Affidavit of John Stewart at 3–4, substantially infringes executive confidentiality, especially in light of the practices that might be adopted, see pp. 339–340 supra, to limit the intrusiveness of review. Cf. United States v. Nixon, supra, 418 U.S. at 706, 94 S.Ct. at 3107 (finding it "difficult to accept the argument that even the very important interest in confidentiality of presidential communications is significantly diminished by production of such material for in camera inspection with all the protection that a district court will be obliged to provide"); Sun Oil Co. v. United States, supra, at 1024. But when that very process is one that must fairly have been anticipated by executive officials in the Nixon administra-

tion, the argument that such screening is likely to stifle free and open communication in the future loses virtually all weight whatsoever.

██ There was, moreover, adequate justification for the congressional decision to entrust custody of the documents and the responsibility for their screening to GSA rather than Mr. Nixon. Chief Executives are not by nature professional archivists, and they lack expertise as to what materials may prove to be of historical value. See H.R.Rep. No. 93–1507, 93d Cong.2d Sess., at 6 (1974) (quoting Franklin D. Roosevelt):

[Presidential material] should be kept in one place and kept in its original form because Presidential papers and other public papers have been culled over during the lifetime of the owner, and the owner has thrown out a good deal of material which he personally did not consider of any importance which, however, from the point of view of factual history, may have been of the utmost importance.

Review of materials such as these requires both enormous expertise and enormous manpower, see Senate Hearings on GSA Regulations at 12–13, 90–132, and Congress could legitimately wish to establish regularized procedures to ensure that the process by which the materials would be reviewed would be adequate to the task. Congress might also have been concerned that those entrusted with reviewing such materials be not only expert, see Affidavit of Daniel J. Reed at

32. The various presidential libraries contain the following numbers of pages of documents from the presidential period: for Hoover, 1 million; for Roosevelt, 10.5 million; for Truman, 5.8 million; for Eisenhower, 11 million; for Kennedy, 13 million; and for Johnson, 17 million. Affidavit of Daniel J. Reed at 2. These figures, especially when adjusted for the number of years each President was in office, reveal both the pattern of increase and the huge gap between Mr. Nixon's 42 million pages of documents and the number of pages of any of his predecessors.

33. See Affidavit of Richard A. Jacobs at 3, 4–5, 5–6, 8 & exhs. A, D, F, G, & I; Affidavit

of William R. Emerson, July 23, 1975, at 1–2; Affidavit of William R. Emerson, July 22, 1975, at 2–3; Affidavit of Daniel J. Reed at 2–3; Affidavit of John Steward at 3–4; Letter of August 12, 1975 from David J. Anderson to R. Stan Mortenson, at 3.

It is true that past Presidents who have deposited materials in presidential libraries have typically removed from the materials deposited, or placed under seal, a few materials which they did not wish even archival personnel to view. But these exclusions have typically centered not on materials involving confidential government decisionmaking, but rather on materials involving personal, political family, and business affairs. See note 54 infra.

2–3, but disinterested. Any former President is virtually certain to be concerned with the light in which history will view the record of his tenure. His quite natural hope is that his conduct will be viewed with favor, and if he were to possess unbridled control over the papers of his administration—the raw materials from which historical judgments will be fashioned—there is always some risk that those items that might paint a different picture from the one he would like to portray will be subject to destruction or alteration, or otherwise unavailable to various government agencies and members of the public.

That risk might rationally be thought by Congress to be considerably magnified by reference to the circumstances surrounding Mr. Nixon's departure from office. The investigations conducted by the House Judiciary Committee (culminating in a recommendation that Mr. Nixon be impeached), the Watergate Special Prosecution Force, and the Senate Select Committee on Presidential Campaign Activities, and the substantial evidence they brought forth which might reasonably have been thought by Congress to suggest that there was misconduct on the part of Mr. Nixon and his close associates, are too familiar and too well-recorded elsewhere to merit elaboration by us. See H.R.Rep. No. 93–1305, 93d Cong., 2d Sess. (1974); S.Rep. No. 93–981, 93d Cong., 2d Sess. (1974); Watergate Special Prosecution Force, *Report,* [hereinafter WSPF *Report*] Oct., 1975, and sources cited 265–73. The temptation to distort or destroy the historical record might be thought by Congress to be less resistible in the event that the materials provided some foundation for allegations that misconduct took place.[34] Without indicating any view about the accuracy of these or any other allegations, we believe that Congress had before it an adequate basis for concluding that responsible processing of the materials in accordance with important public interests could be better ensured if the materials were entrusted to government archivists.[35]

The simplest way of describing the public interests served by the Act is to merge all of them under the rubric of

---

**34.** It is instructive to note the fate of the papers accumulated during the administration of Warren Harding, whose presidency was marked by the Teapot Dome affair, a highly publicized political scandal which, at least in terms of notoriety, was not unlike Watergate. After Harding's death while in office, the papers were packed and stored. Mrs. Harding undertook to remove and examine the "Private Office" material, and "[h]er objective seems to have been the destruction of any material which might have proven harmful to the memory of her husband." She burned some papers while they were still at the White House. After the remainder were shipped to Ohio, Mrs. Harding "alternately designat[ed] individual items or entire folders for destruction. . ." "The amount [sic] of files destroyed by Mrs. Harding cannot be accurately ascertained; though gaps in the file numbers of the private office papers do indicate that she may have burned as much or more than half the material available to her." Lentz, *The Warren G. Harding Papers,* at 2–3 & n. 3 (Ohio Historical Society, Columbus, Ohio 1970).

The presidential papers of Presidents Pierce, Arthur, and Coolidge may have suffered from destruction initiated or authorized by these Presidents. McDonough, *Who Owns Presidential Papers?,* 27 Manuscripts 2, 5 (1975).

**35.** Mr. Nixon suggests in his Reply Brief at 5 that if Congress' real concern were preservation of the materials from destruction, legislation could have been more narrowly tailored merely by prohibiting Mr. Nixon or anyone else from destroying any materials. We believe this argument misses the point. To begin with, Congress might legitimately have entertained doubts about whether Mr. Nixon would not violate such a prohibition. Moreover, placing the materials in custody not only insures against destruction—it also is the predicate to establishing a certain and effective review process to classify the materials, and to the extent that is permitted constitutionally, to provide access to them. A law that prohibited destruction and mandated government custody to ensure safekeeping, but nothing more, would not adequately serve congressional objectives, for those objectives are broader than mere prevention of destruction, and as we proceed to discuss, depend upon making the materials available within the shortest possible time to various government agencies or members of the public.

preservation of an accurate and complete historical record. Although such a characterization is justifiable, it belies the multiplicity of ways in which preservation serves vital national interests. Two interests in particular seem to us to be of special importance and plainly to be furthered by the Act, even were restrictive controls on access by the general public imposed by regulation.

 First, and most broadly, the Act serves the national interest by preserving materials upon which historians must draw in order accurately to recount and to judge the political history of our time. *See, e. g.,* S.Rep. No. 93–1181, 93d Cong., 2d Sess., at 1, 3 (1974); H.R.Rep. No. 93–1507, 93d Cong.2d Sess., at 2, 3, 8 (1974); *Senate Hearings on GSA Regulations* at 256; 120 Cong.Rec. S 16871 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); *id.* at S 18235 (daily ed. Oct. 3, 1974); *id.* at S 18248 (remarks of Sen. Ervin); *id.* at S 18259 (remarks of Sen. Huddleston); *id.* at S 18260 (remarks of Sen. Ribicoff); *id.* at S 18261 (remarks of Sen. Muskie); *id.* at S 18325 (daily ed. Oct. 4, 1974) (remarks of Sen. Nelson); *id.* at H 11207 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas). *See also*

sections 101(b)(1), 104(a)(7) of the Act.[36] Moreover, the Act may provide a scheme by which the materials are not only preserved, but may be screened promptly and professionally to ensure that when materials become available to public access, they will be readily usable. *See generally, e. g., Hearings on GSA Regulations* at 1–232. Congress might properly have shared the sentiment of Harry S. Truman that is inscribed at the entrance to the library housing the presidential papers of his administration:

This library will belong to the people of the United States. My papers will be the property of the people and be accessible to them. And this is as it should be. The papers of the Presidents are among the most valuable sources of material for history. They ought to be preserved and they ought to be used.

*Whistle Stop: The Harry S. Truman Library Institute Newsletter,* Vol. 3, No. 2, Spring, 1975, at 1.[37] It would serve little purpose to recount all of the ways in which the ability of a nation's citizens to understand their past enriches their lives and helps them to evaluate and perhaps to shape the present and future.[38] It

**36.** As of June 30, 1975, the Roosevelt library had issued 5,009 research passes, each valid for one year. Some 222 of the researchers using these passes were representatives of the media or employees of local, foreign, or the Federal governments. The remainder were scholars, students, writers, genealogists, and other researchers. Affidavit of William R. Emerson, July 22, 1975, at 3. Plainly, then, the Roosevelt library has been widely used for historical purposes.

**37.** President Truman is not the only former Chief Executive to recognize the importance of this need. *See* note 53 *infra.* Indeed, Mr. Nixon himself has stated that he believes the materials at issue to be of great importance to future historians:

A. [Mr. Nixon] . . . My reason for approving [the tape recording system in presidential offices] was primarily because of the historical significance of it, particularly in the foreign policy area, of the conversations that were taking place and I felt having those conversations taped for

purpose [sic] of history would be very, very useful and that it [sic] why it was done.
Q. That was the reason?
A. That was my primary motivation.
Nixon Deposition at 72–73.

**38.** Senator Huddleston expressed one view as follows:

There is a maxim which says we should learn from history in order not to repeat our mistakes. However, if one man is allowed to selectively edit a substantial portion of our history at his own discretion we may very well be destined to repeat our mistakes, only on a grander scale next time. This is why it is extremely vital that we provide the means for settling this matter as soon as possible.

120 Cong.Rec. S 18259 (daily ed. Oct. 3, 1974).
The distinguished English historian J. H. Plumb has recently discussed with eloquence the uses of history:

There has so far always been a need in human societies to possess a sense of worth and of value. This, of course, may be provided in non-historical ways. . . .

should suffice to say that promotion of such understanding could hardly be more integral to a society based on democratic principles and devoted to freedom of expression in the political sphere as well as others.[39]

 Second, preservation of these materials is needed to ensure their availability for successive administrations engaged in policymaking. *See* S.Rep. No. 93–1181, 93d Cong., 2d Sess., at 3, 4, 5 (1974); H.R.Rep. No. 93–1507, 93d Cong., 2d Sess., at 3 (1974); 120 Cong.Rec. H 11211 (daily ed. Dec. 3, 1974) (remarks of

Rep. Abzug). *See also* section 102(d) of the Act. Governmental programs and policies do not expire every four or eight years; the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated. In both the first presidential transition, from George Washington to John Adams, and the most recent transition following Mr. Nixon's resignation, as well as in many others, the importance of this need has been recognized by making some provision for continued access to documents of the outgoing administration.[40] That practice

---

Some men and women can derive it from the richness of their own instinctive lives. . . . The majority of men and women, however, need the dimension of time because they are conscious of it. They realize that they are part of an historical process that has changed over the centuries, that time for men and women and their societies can never be static, or at least has never been static; that the process of change has accelerated and is accelerating so that they require to know what the nature of this process has been and is. They need an historical past, objective and true.

. . . . .

It is not only necessary to discover, as accurately as the most sophisticated use of evidence will allow, things as they actually were, but also why they were so, and why they changed; for no human societies, not one, have ever stood still. Although we carry within ourselves and within our societies innumerable relics of the past, we have discarded, outgrown, neglected and lost far more. . . . The historian's purpose, therefore, is to deepen understanding about men and society, not merely for its own sake, but in the hope that a profounder knowledge, a profounder awareness will help to mould human attitudes and human actions.
J. Plumb, The Death of the Past 16, 105–06 (1970). *See also* Judge Gasch's Memorandum-Order of April 23, 1975 in *Don't Tear It Down, Inc. v. GSA*, Civil No. 74–381 (D.D.C. filed Mar. 4, 1974), at 10–11, *reported in* 103 Daily Wash.L.Rep. 1921, 1925 (Nov. 11, 1975).

**39.** *See Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring):
 Those who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberative forces should prevail over the arbitrary. They val-

ued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.
*See also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed. 328 (1975) ("Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records . . . ."); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 392, 89 S.Ct. 1794, 1804, 23 L.Ed.2d 371 (1969) ("the First Amendment goal of producing an informed public capable of conducting its own affairs"); *Buckley v. Valeo, supra*, 519 F.2d at 867; *Attorney General v. Jonathan Cape Ltd., supra* note 30 (permitting publication of confidential diaries of a British Cabinet Minister serves the "public interest" in "freedom of speech"); Meiklejohn, *The First Amendment is an Absolute*, 1961 Sup.Ct.Rev. 245, 255–57.

**40.** When George Washington left office, he employed two men who had served as his secretaries
 to separate from his papers those files which were intended for his successor in office, John Adams, and to pack and send the remainder to Mount Vernon. It was later discovered, as the result of a request from Attorney General Charles Lee, that two bundles containing original opinions of the Heads of Departments were still in the possession of the Secretary of State, who had

has not, to be sure, been uniform, but that nonuniformity may only reinforce the validity and cogency of a congressional view that records of past executive policymaking ought to be preserved so that future administrations can have ready access to them and a desire to institutionalize arrangements conducive to such a practice. As is described in detail in note 1 *supra*, the materials which plaintiff claims the right to control include vital information relating to domestic policymaking conducted entirely within the White House or by the White House in conjunction with executive agencies, and records of communications with foreign governments or White House communications with executive agencies concerning foreign affairs. Much of this information is contained only in the materials under dispute in this case. There are numerous examples in the record of incumbent administrations having to apply to presidential libraries for permission to examine records of past government actions that relate to current government problems [41]

---

borrowed and failed to return them. He promptly made arrangements for their return.

Index to the George Washington Papers, Library of Congress, Manuscript Division, at vii (1964).

Julian P. Boyd, the editor of the Thomas Jefferson papers, in his Affidavit at 2–3 stated that Jefferson never explained the principle underlying his practice in disposing of papers, but described that practice as follows:

> During his two terms as President, Jefferson was extremely meticulous in depositing in the various departmental offices—State, Treasury, War, Justice, and Post Office—every document having any relation to the conduct of the public business or being in any sense official in nature. As a result, the vast bulk of records of an official nature generated during Jefferson's presidency are still to be found in the various departmental record groups in the National Archives.

There are several more recent examples of such a practice. After Franklin Roosevelt's death during World War II, it was clearly essential that materials relating to the war effort remain available to the Truman administration. Pursuant to an agreement between Truman and the executors of Roosevelt's estate the so-called Map Room papers remained in government custody until the Executive no longer had need for them. Affidavit of William R. Emerson, July 22, 1975, exh. C. When President Johnson suddenly assumed office after the assassination of John F. Kennedy, "it was deemed necessary to retain most of President Kennedy's files at the White House for the time being for use by the Staff." Affidavit of William J. Hopkins at 12. More than 18 months after that transition, the executors of President Kennedy's estate expressly indicated that the Archivist of the United States was authorized to make available to President Johnson any materials needed by him in the performance of his duties as President. Affidavit of Richard A. Jacobs, exh. H. Most recently, when Mr. Nixon left office, all originals of virtually all papers, see note 1 *supra*, were boxed for shipment, but staff members were to make copies of documents necessary for continuity in government. Nesbitt Deposition at 40. *See also* Nixon Deposition at 130, 134–36 (conceding that various materials may aid continuity in government, but suggesting that a former President must control them to preserve executive confidentiality). *See also* note 53 *infra*.

It is no doubt true that the need for retention of records is most critical during wartime or after a sudden change in administration. That does not indicate, however, that the need is not great in ordinary times.

41. Evidence in the record establishes that numerous requests have been made by officials of incumbent administrations for access to materials housed in presidential libraries. It is uncertain and perhaps doubtful that the record reflects all requests, formal or informal, that have been made, nor it is always clear whether particular requests were pursued and ultimately fulfilled. Although the preponderance of requests have related to foreign affairs, a not insignificant number have involved domestic policy. The requests made have related to such diverse topics as ongoing policymaking in the field of foreign affairs; preparation of historical accounts by the State Department, CIA, military, and Atomic Energy Commission; a New Deal dam project; pending litigation involving the Federal Government; and the funding of the Kennedy Center.

For the relevant evidence, *see* Affidavit of John S. D. Eisenhower at 7–8; Affidavit of Daniel J. Reed, exh. D, at 79; Affidavit of John Stewart at 2–3; Deposition of Jack Nesbitt at 72; Letter of July 23, 1975 from William R. Emerson, Director of the Roosevelt Library, to R. Stan Mortenson, at 2; Affidavit of William R. Emerson, July 22, 1975, at 3 & exhs. D, E, G, H, I, K, L, M, N, O, P, T, U; Letter of July 18, 1975 from John E. Wickham, Director of the Eisenhower Library, to R. Stan Mortenson, at 1. *See also* Affidavit of Jeanne W. Davis at 5–6.

—permission that has not uniformly been granted.[42] We agree with the assessment of this state of affairs made by Arthur Schlesinger, Jr.:

No President should ever have to apply to the library of one of his predecessors, as President Kennedy had to apply to the Eisenhower Library in 1962 to find the memorandum of a presidential conversation with an English Prime Minister, or as President Johnson had to apply to the same library in 1967 for presidential correspondence with a Prime Minister of Israel.

Schlesinger, *supra* note 14, at 180. Precedent as old as Justice Story's opinion in *Folsom v. Marsh*, 9 F.Cas. 342, 347 (No. 4901) (C.C.D.Mass.1841), and as recent as the 1974 Opinion of the Attorney General on ownership of presidential papers, 43 Op.Att'y Gen. No. 1 (Sept. 6, 1974), at 5–7, has recognized the importance of this need, as did Congress with respect to executive records generally, rather than presidential materials specifically, when it enacted the Federal Records Act of 1950, 64 Stat. 583, *codified in* 44 U.S.C. §§ 2101 *et seq.* (1970). We believe Congress could legitimately believe it important to legislate, as it did, to ensure that this need is served by a regularized and certain procedure.[43]

.

There have already been a number of requests for materials from the Nixon administration. *See* Letter of July 29, 1975 from R. Stan Mortenson to Andrew Krulwich, and attachments thereto.

**42.** The only incident of this nature plainly established in the record occurred during President Kennedy's administration. One of the issues in American foreign relations at that time was providing assurances to France that the United States' nuclear deterrent was reliable. In expressing doubts about such reliability, the French Government alleged that during the 1956 Suez Crisis the United States had failed to support France and Britain after the Soviet Union had threatened a nuclear attack if the Suez operation continued. C. Douglas Dillon, Ambassador to France in 1956 and later Secretary of the Treasury, contended that the French allegations were inaccurate and sought to find a telegram he sent to Washington in 1956 indicating that he had provided firm assurances to France. After failing to locate it in State Department files, officials of the Kennedy administration requested John S. D. Eisenhower—the former President's son and the individual in charge of his papers—to search for the telegram in question. Mr. Eisenhower had doubts that that request truly involved national security, *see* Affidavit of John S. D. Eisenhower, exh. B, and responded that the request would be honored only if made personally by Secretary of Defense McNamara to President Eisenhower. McNamara decided, in light of the need to preserve cordial relations with President Eisenhower and to minimize the number of requests for materials, not to pursue the matter and to rely merely upon Mr. Dillon's recollection. Affidavit of Paul H. Nitze, at 2–6. *Cf.* pp. 95–96 & note 68 *infra.*

**43.** Plaintiff asserts a number of challenges to the legitimacy or importance of this interest as a basis for upholding the Act, all of which we believe are without merit. First, he argues that this purpose was not considered by Congress and is nothing more than a *post hoc* rationalization. Plaintiff's Reply Brief at 7. Even were we to assume that a court is foreclosed from considering purposes mentioned in litigants' briefs but not in the legislative record, an issue about which we express no opinion, *see generally* Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L.Rev. 1, 43–47 (1972), that would be beside the point, as there is ample evidence in the legislative record, cited above in text, that this purpose was considered in Congress and the purpose is apparent from the face of the Act, *see* § 102(d).

Second, Mr. Nixon states that the representative of President Ford who negotiated the Nixon-Sampson agreement evidently felt that it satisfied the Executive's needs. Plaintiff's Reply Brief at 7. We do not believe that approval by a brand new Chief Executive of an agreement negotiated in some haste and, as plaintiff himself notes, *see* p. 372 *infra,* in a time of some turbulence, necessarily represents the considered judgment of the executive branch, especially since such a contention is to some extent inconsistent with President Ford's having signed the Act. In any event, we are certain that Congress is not bound to accept as conclusive whatever view of the needs of executive continuity a document such as the Nixon-Sampson agreement might be thought to imply.

Plaintiff also asserts at p. 9 of the Reply Brief that no refusal by Mr. Nixon to permit access to documents for national security purposes has been presented. The short answer to this argument is that Congress need not wait until executive needs have not been ful-

■ Although these two interests strike us as the most significant, there are three other interests of considerable force that are served by this Act. First, the events of the past years, and the widespread allegations surrounding them, might properly be thought by Congress to have undermined the nation's faith in its political processes and its confidence in its future. *See* 120 Cong.Rec. S 18258 (daily ed. Oct. 3, 1974) (remarks of Sen. Cranston); *id.* at S 18260 (remarks of Sen. Ribicoff). To the extent that short-term public access is consistent with preservation of constitutional rights and privileges, a full airing of these events by disclosure of materials whose contents are peculiarly informative is surely a legitimate congressional pursuit. *See* S.Rep. No. 93–1181, 93d Cong., 2d Sess., at 3, 4, 6 (1974); H.R. Rep. No. 93–1507, 93d Cong., 2d Sess., at 2, 8; 120 Cong.Rec. S 16871 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); *id.* at S 18233, 18235 (daily ed. Oct. 3, 1974); *id.* at H 11207 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas); *id.* at H 11211 (remarks of Rep. McKinney). *See also* section 104(a) of the Act. And here too, disclosure serves values at the core of the First Amendment. *See* pp. 349–350 and note 39 *supra.*[44]

■ The documents and tape recordings are important to the legislative branch because they enable Congress to understand how our political processes have operated, a necessary predicate to informed consideration of the appropriateness of legislative reform and changes in institutional design. *See* S.Rep. No. 93–1181, 93d Cong., 2d Sess., at 3, 4 (1974); H.R.Rep. No. 93–1507, 93d Cong., 2d Sess., at 2, 3, 8 (1974); 120 Cong.Rec. S 16871 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); *id.* at S 18235 (daily ed. Oct. 3, 1974). The congressional power to investigate, although limited to areas in which Congress possesses legislative authority, *Eastland v. United States Servicemen's Fund, supra,* 421 U.S. at 504 n. 15, 95 S.Ct. 1813, is both broad and integral to the legislative process, *id.* at 504–05, 95 S.Ct. 1813 and cases cited. Information from both recent and more distant years may be essential to guide legislative decision-making,[45] and therefore, by preserving the Nixon presidential materials, the Act serves to aid the legislative process.[46]

---

filled in order to legislate on important matters of public administration; surely "preventive medicine" is a legitimate legislative technique. Mr. Nixon also asserts that the Act is overbroad with respect to this purpose. However, in light of the manner in which all of the documents are mingled, *see* p. 355 *infra,* comprehensive review would be necessary to ensure that all materials relating to this purpose could be segregated. Although the factors listed under section 104(a) of the Act do suggest that the regulations promulgated thereunder may be directed to other purposes as well, we believe those purposes to be entirely valid. And legislation is not overbroad when there is no narrower way to serve all of the various purposes to which it is directed. *Cf.* Note, *Legislative Purpose, Rationality, and Equal Protection,* 82 Yale L.J. 123 (1972). With respect to the entire range of purposes involved—especially the interest in preserving a complete and accurate historical record—the Act on its face is not overbroad. *See* p. 355 *infra.*

**44.** Although Mr. Nixon appears at one point to concede the legitimacy of this interest, *see* Reply Brief at 16–17, elsewhere he suggests it is

illegitimate, *see id.* at 69–70 and n. 42. For reasons outlined in note 16 *supra,* we believe that the latter position must be rejected.

**45.** The record provides examples of such requests made by members of Congress or congressional committees to presidential libraries to use materials, requests that have often been honored. *See* Affidavit of Harry J. Middleton at 4; Affidavit of William R. Emerson, July 22, 1975, exhs. S, U; Affidavit of Daniel J. Reed at 3; Affidavit of John Stewart at 2. A number of requests have already been made by Congress to obtain from Mr. Nixon materials claimed to be relevant to matters of congressional concern. *See* Affidavit of Raymond G. Larroca at 4–5.

**46.** Plaintiff at 182–85 of his brief suggests that both this interest and that in informing the public cannot be considered to be especially important in light of the court of appeals' decision in *Senate Select Comm. v. Nixon, supra.* That decision held that the need asserted by the Select Committee was insufficiently compelling to outweigh the need to preserve executive confidentiality. Although there is some language in the opinion that might be thought

Finally, these materials are important to the Judiciary in the event that they might shed light upon material issues in civil or criminal litigation. *See* S.Rep. No. 93–1181, 93d Cong., 2d Sess., at 1, 4, 6 (1974); H.R.Rep. No. 93–1507, 93d Cong., 2d Sess., at 2, 3, 8 (1974); 120 Cong.Rec. S 16870–71 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); *id.* at S 18233 (daily ed. Oct. 3, 1974); *id.* at H 11207 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas). *See also* sections 102(b), 104(a)(2) of the Act. Plaintiff has reminded us that, under the Nixon-Sampson agreement, all materials would be available to judicial process for a period of three years, and the tape recordings for five. *See* Reply Brief at 2–4; pp. 10–12 *supra*. And we note in addition that the Special Prosecutor has indicated that he has fulfilled his need for the materials in the investigations he has undertaken. *See* pp. 16–18 & note 11 *supra*. These facts do not, however, dispose of the genuine need of the Judiciary. In the first place, the agreement was only one between Mr. Nixon and the executive branch, and Congress might have been concerned that it was not immune from amendment. More important, there was no assurance that the need for evidentiary material in litigation would no longer exist after the three-year period. New needs in existing cases might arise; new actions might be brought; in the case of criminal prosecutions, retrials might take place if convictions were reversed upon appeal. The enormous volume of litigation related to Watergate or involving Mr. Nixon, civil and criminal, that has taken place or is now pending, see WSPF *Report* at 155–68; Affidavit of Raymond G. Larroca at 6–8,[47] indicates the importance of this interest and belies any notion that three years is a magic period after which the needs of litigants for materials covered by the Act will suddenly disappear.[48]

to support plaintiff's contention, see 498 F.2d at 732, we believe plaintiff's reading is overly broad and therefore misleading. The court repeatedly emphasized that its holding was peculiarly dependent upon the special circumstances of that case. *See id.* at 731 ("[p]articularly in light of events that have occurred since this litigation was begun"); *id.* at 732 ("In the circumstances of this case, we need neither deny that the Congress may have, quite apart from its legislative responsibilities, a general oversight power . . . ."); *id.* at 733 (emphasizing "the peculiar circumstances of this case"). The committee's argument that it had a vital need for the material sought was undercut by three important factors: first, the fact that much of the material had, during the pendency of the suit, been voluntarily released by Mr. Nixon, see *id.* at 732–33; second, the fact that the House Judiciary Committee, whose functions substantially overlapped with the Select Committee, had in its possession copies of each of the tapes subpoenaed by the Select Committee, making the need merely cumulative, see *id.*; and third, at least in the view of the District Court, disclosure might have prejudiced pending criminal prosecutions, see *Senate Select Comm. v. Nixon*, 370 F.Supp. 521, 522–23 (D.D.C.1974). Moreover, the attempt to obtain materials in that case was at the behest of a single committee of one House of Congress rather than under an Act approved by both Houses and signed and supported by the President. *See* Freund, *supra* note 27, at 38; Sofaer, *supra*, at 292 (by impli-

cation); *cf. O'Brien v. Brown*, 409 U.S. 1, 5, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972) (per curiam). Additionally, the *Senate Select Committee* court did not consider the possibility of permanent destruction or unavailability of the historical record in reaching its decision. Finally, we note that the infringement of executive confidentiality caused by screening materials under this Act is, for reasons already discussed, much more limited than release of materials to a congressional committee whose design was in part to inform the public.

**47.** The record also indicates that on at least two occasions, the Truman administration obtained materials from the Roosevelt Library for use in civil litigation that arose seven to eight years after the materials were prepared. Affidavit of William R. Emerson, July 22, 1975, exhs. E, K.

**48.** Mr. Nixon asserts in his Reply Brief at 5–7 that this congressional purpose is nothing more than an attempt to strip him of the privileges and defenses he might assert were legal process directed to materials in his control. Although we do not need to reach any questions of use of materials after processing has taken place, we do note that Mr. Nixon's suggestion flies directly in the face of section 102(b) of the Act, expressly reserving his rights, defenses and privileges as against legal process, as well as the more general considerations outlined in Part II *supra*. Moreover, at least as respects the privilege protecting executive confidentiality, it is clear that such objec-

Plaintiff alleges that the Act is overbroad with respect to various of these purposes. We do not believe this to be the case. The Act authorizes retention by the government of only those materials that in some manner have historical significance. *See* sections 101(b)(1), 104(a)(7); note 6 *supra*. It may be true that some of the materials to be retained may never be needed by any historian, member of the public, or branch of government. However, adequate foresight does not exist to permit anyone today to determine what materials may acquire importance, in relation to the congressional objectives, over time. Virtually any item might be needed by a historian, depending upon what subjects seem fit to study some years from now. To a lesser degree, the same point can be made as respects any of the other purposes. Especially insofar as Congress may have wished to establish a practice conducive to widespread use of these materials for all purposes, the retentions cannot be thought to be overbroad.

 Nor does it strike us that Congress failed to employ the most narrow means available to screen materials effectively. It is true that archivists will, in the course of reviewing materials, be required to review both (1) materials outside the coverage of the Act and which are plainly plaintiff's private property—for example, various pre-presidential materials of Mr. Nixon's, *see* Nixon Affidavit at 2, and (2) materials which, regardless of the state of title, may contain confidential or private communications about a wide range of matters.

But those intrusions are inevitable given the manner in which the materials are intermingled. *See* Affidavit of Thomas R. Wolf at 3. In the White House Central Files, *see* note 1 *supra*, no attempt was made to segregate personal, political, or official documents. Affidavit of William J. Hopkins at 8. Moreover, materials from staff employees in the White House were gathered in great haste following Mr. Nixon's resignation, and little is known about the contents of many of the boxes in which they are stored. Deposition of Jack Nesbitt at 42–46; Affidavit of William F. Matthews at 6. Even individual documents may contain both communications that are related to governmental duties, are of great historical interest, and are neither private nor confidential, and communications that are extremely private and confidential and of no historical significance. Affidavit of William J. Hopkins at 8. Thus, as a rule, it is necessary to review each document to some extent in order to classify it. Affidavit of Richard A. Jacobs at 8. As for the tape recordings, they shift suddenly and unpredictably among various subjects of conversation, so that again the comprehensive review necessary to identify conversations related to legislative objectives necessarily will intrude on conversations that may be private, confidential, or wholly unrelated to those objectives. Affidavit of Raymond G. Larroca at 1–4. Because the intermingled state of the materials allows no effective manner of identifying and classifying the materials other than the scheme broadly contemplated under this Act, we find that the Act is not overbroad.[49] Moreover, it was

tions to process, even if constitutionally-based, may be overridden where the need is sufficiently great. *See United States v. Nixon,* 418 U.S. at 703–14, 94 S.Ct. 3090, note 50 *infra.*

**49.** Regardless of where title in the materials is thought to lie, Congress plainly has authority to pursue these purposes. Insofar as the materials are Mr. Nixon's personal property, they are subject to condemnation under the eminent domain power, and Congress has provided in § 105(c) compensation for any taking of private property that may be effected. Although such condemnation must qualify as a

public use, the scope of legislative power is very broad:

Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation . . . .. This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one.

necessary for Congress not merely to take custody of the materials, but also to ensure that their processing commenced promptly so that, to the maximum extent possible, the numerous requests for access to materials that had already been received, see notes 41, 45 supra, or could reasonably be expected, would not have to be denied (as had happened in the past, see sources cited note 68 infra) merely because the requested materials had not been processed. See p. 371 infra. We conclude, therefore, that the great importance of congressional purposes here far outweighs the need to prevent the very limited intrusion on whatever interest—if any—in presidential confidentiality Mr. Nixon may assert, and hence find his separation of

Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954); accord, United States ex rel. TVA v. Welch, 327 U.S. 546, 551–52, 66 S.Ct. 715, 90 L.Ed. 843 (1946). In United States v. Gettysburg Elec. Ry., 160 U.S. 668, 682–83, 16 S.Ct. 427, 430, 40 L.Ed. 576 (1896), the Supreme Court, in upholding condemnation of land for the purpose of studying the historic Gettysburg battle, indicated that the power to condemn for historical purposes is not to be narrowly construed:

> Such a use seems necessarily not only a public use, but one so closely connected with the welfare of the republic itself as to be within the powers granted congress by the constitution for the purpose of protecting and preserving the whole country. . .
>
> No narrow view of the character of this proposed use should be taken. Its national character and importance, we think, are plain.

Accord, Roe v. Kansas, 278 U.S. 191, 193, 49 S.Ct. 160, 160, 73 L.Ed. 259 (1929) ("there is no basis for doubting the power of the state to condemn places of unusual historical interest for the use and benefit of the public"); Barnidge v. United States, 101 F.2d 295, 298–99 (8th Cir. 1939) ("Primarily, the right to determine the purpose to be a public one is in Congress"; "We have no doubt of the power of the United States, under the Constitution, to acquire by eminent domain, or otherwise, sites of national historic significance . . . ."); United States v. Certain Parcels of Land in City of Philadelphia, Pa., 99 F.Supp. 714, 717 (E.D.Pa.1951), aff'd, 215 F.2d 140 (3d Cir. 1954). The discussion in text of the various historical purposes served by this Act should make it crystal clear that Congress was well within the scope of its power to condemn for historical purposes any property thought to be Mr. Nixon's.

Plaintiff alleges that the power of eminent domain cannot be employed to condemn personal papers rather than real property. However, he provides neither authority for such a contention nor any reason why a distinction between papers and real property should be of constitutional dimension. And it is clearly established that the power of eminent domain extends both to intangibles, see Cincinnati v. Louisville & Nashville R. R. Co., 223 U.S. 390, 400, 32 S.Ct. 267, 56 L.Ed. 481 (1912), and to the product of intellectual activity, see Interdent Corp. v. United States, 488 F.2d 1011, 203 Ct.Cl. 296 (1973) (per curiam). To be sure, prior cases may not have involved condemnation of property implicating privacy interests, but the eminent domain power does not fail whenever privacy concerns arise. Instead, that power remains, subject—like all other sources of congressional power—to the limitation that it must be exercised in a manner consistent with the Bill of Rights. See Berman v. Parker, supra. The thrust of plaintiff's challenge to any use of eminent domain power seems to consist of allegations that the exercise of that power in this case has violated plaintiff's personal rights, rather than that the purposes whose promotion Congress sought lie outside the legislature's constitutional authority. The parts of this opinion that follow consider whether the Act infringes plaintiff's individual rights.

Insofar as the materials at issue are thought to be the, property of the Government rather than that of plaintiff, the source of congressional authority would be Art. IV, sec. 3, which provides in relevant part:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . .

Legislation such as the Freedom of Information Act, 5 U.S.C. § 552 (1970), see note 16 supra, and the Federal Records Act, 44 U.S.C. §§ 2101 et seq. (1970), whose constitutionality seems unquestioned, is premised upon this grant of power. Cases construing this section of Article IV have adopted a broad interpretation of Congress' power thereunder. See Alabama v. Texas, 347 U.S. 272, 277, 74 S.Ct. 481, 483, 98 L.Ed. 689 (1954) ("The responsibility of Congress is to utilize the assets that come into its hands as sovereign in the way that it decides is best for the future of Nation."); United States v. Gratiot, 39 U.S. (14 Pet.) 526, 538, 10 L.Ed. 573 (1840) (the question of how to dispose of government property "must be left to the discretion of congress"). Plaintiff makes no attempt to challenge this well-established power, and we believe the Act falls well within this congressional authority insofar as it might regulate public property.

powers and presidential privilege points to be without merit.[50]

## IV. CLAIMS RELATING TO PRIVACY

▮▮▮ The most troublesome challenge that plaintiff raises is that the Act violates his constitutionally based right of privacy. Although his brief bifurcates this claim, presenting both a right of privacy and a search and seizure claim, we do not believe that the two are genuinely distinct. The argument setting forth the right to privacy claim relies heavily upon search and seizure precedents, not surprisingly as, in our view, the Fourth Amendment provides by far the clearest and best-established source of constitutional protection of privacy.[51] Moreover, the key in adjudicat-

**50.** Mr. Nixon argues in his Reply Brief at 44–48 that the presumptive privilege recognized in *United States v. Nixon* requires persons seeking to overcome a claim of privilege to make a strong showing of need—stronger than mere relevance—to rebut the presumption before even *in camera* screening, or in this case archival processing, can take place. There is support for this view in the language of that decision, *see* 418 U.S. at 713, 94 S.Ct. 3090, *quoting United States v. Burr*, 25 F.Cas. 30, 192 (No. 14,692d) (C.C.D.Va.1807) (Special Prosecutor is required to demonstrate that material under subpoena was " 'essential to the justice of the [pending criminal] case,' "); *id.* at 713–14, 94 S.Ct. at 3110 (suggesting a need for a sufficient showing to rebut the presumptive privilege), in other decisions, *see Senate Select Comm. v. Nixon, supra,* 498 F.2d at 729–30; *Nixon v. Sirica, supra,* 487 F.2d at 705–06, 717, and in the opinions of commentators, *see* Freund, *supra* note 27 at 31; *The Supreme Court, 1973 Term,* 88 Harv.L.Rev. 41, 61 (1974). On the other hand, a similarly strong argument, based on the same kinds of sources, can be made for the proposition that mere relevance is all that is required to rebut the presumptive privilege. *See United States v. Nixon, supra,* 418 U.S. at 709, 94 S.Ct. at 3108 ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. . . . The very integrity of the judicial system . . . depend[s] on full disclosure of all the facts, within the framework of the rules of evidence."); *id.* at 714, 94 S.Ct. at 3110 ("Statements that meet the test of admissibility and relevance must be isolated; all other material must be excised."); *id.* at 712–13, 94 S.Ct. at 3110:

. . . The allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts. . . . The President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases.

*See also Sun Oil Co. v. United States, supra,* 514 F.2d at 1024–25; *Smith v. Schlesinger,* 513 F.2d 462, 477 & n. 52 (D.C.Cir. 1975); *Cox, supra,* at 1414; *Ratner, supra,* at 96–98.

We need not, we believe, indicate our agreement with one or the other of these interpretations. For, in our view, either a former President may not validly claim executive privilege at all, or if he may do so, his claim is entitled to much less weight than that accorded a claim asserted by an incumbent President. It follows that a claim of privilege by a former President may be overcome by a showing less strong than that needed when the incumbent raises the claim. Since we believe the materials are manifestly relevant to import government interests asserted here, and since here— as was not true in *United States v. Nixon* —confidential examination of materials will not necessarily have as its purpose identification of materials to be turned over immediately to other government officials and perhaps to be used at public criminal trials, we do not believe that recognition of a presumptive privilege prevents screening by government archivists.

**51.** Insofar as Mr. Nixon's privacy claim rests upon the privacy in political association protected by the First Amendment, it is discussed separately in the next part of this opinion. Insofar as Mr. Nixon suggests that he has a general right of privacy different from and broader than the protection of the Fourth Amendment, we must reject that argument. In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967), the Supreme Court discussed the various sources of constitutional protection of privacy. It noted that the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion" and that other provisions of the Constitution, such as the First Amendment, also provide specific protection against particular government actions in some way involving personal privacy. But the Court noted that a "general right to privacy" finds support not in the Constitution but only, if at all, in the law of particular states. *Id.* at 350–51 & n. 5, 88 S.Ct. 507. The only decision plaintiff cites to suggest otherwise is *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). Although there is some broad language in *Stanley* that could be read to suggest a general

ing a search and seizure claim is whether an individual can demonstrate an invasion of his "reasonable expectation of privacy." *E. g., Katz v. United States,* 389 U.S. 347, 351–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *id.* at 360–61, 88 S.Ct. 507 (Harlan, J., concurring). The extent to which there is such an invasion, and the justification for it, must be the focus in adjudicating both claims, and they may be discussed jointly.

We reiterate at the outset that we concern ourselves only with the constitutional questions raised with respect to the process by which the screening will be performed. Since any claim by plaintiff that his privacy will be invaded by public access to private materials must be considered premature when it must actually be directed to the regulations once they become effective, we need not consider how the materials will be treated after they are reviewed. *See* pp. 334–339 *supra.*[52]

 It is difficult to know precisely how many of the 42 million pages of documents and what proportion of the 880 tape recordings implicate plaintiff's privacy, but the ratio appears to be quite small in both cases. As far as the documents go, if plaintiff himself saw no more than 200,000, *see* p. 345 *supra,* we find it difficult to believe that more than a tiny fraction of them contain materials which Mr. Nixon reasonably expected to be private. Included within the materials falling under the Act, for example, would be internal memoranda from an executive agency which, after review by numerous individuals in that agency, were transmitted to a member of the White House staff but never to Mr. Nixon, *see* note 1 *supra;* the attenuated connection of such material to Mr. Nixon and the exposure to many others makes any privacy claim in such materials on his part impossible to sustain. Wherever bare legal title may be thought to reside in respect of the papers here in issue, it seems clear that the great bulk of them—those relating to the conduct by Mr. Nixon of his duties as President and a political leader of the nation—are quite unlike private property in light of the great public interest attaching to them. It is of course black letter law that the Fourth Amendment protects privacy and not property, *e. g., Cardwell v. Lewis,* 417 U.S. 583, 589, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion); *Warden v. Hayden,* 387 U.S. 294, 304, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), but in this case the two may not be wholly distinct concepts. Rather, the public trust in the bulk of these papers[53]—be it

right of privacy, *see id.* at 564, 89 S.Ct. 1243, the decision in that case rested on the special conjunction of privacy and free speech challenges to a conviction for the possession in a private home of obscene matter, and emphasized the traditional First Amendment aspects of the case, *see id.* at 559–64, 565–67, 89 S.Ct. 1243.

**52.** The Proposed Regulations, *supra* note 13, would provide not insignificant protection of personal privacy. First, any individual would have the opportunity to assert any legal or constitutional right or privilege which would prevent or limit public access, and have an administrative determination, with ultimate access to judicial review, as to the validity of the claim. § 105–63.401–1(a), (c). Second, with respect to materials of historical significance unrelated to abuses of governmental power, access will be restricted to materials whose release would "constitute a clearly unwarranted invasion of personal privacy or result in the defamation of a living person. . . ."

§ 105–63.402–2(b)(2). With respect to materials that are related to abuses of government power, access restrictions will be imposed in the same circumstances as above, subject, however, to the proviso that no restrictions shall be imposed on access to personal information "essential to an understanding of the abuse of governmental power." § 105–63.402–1(b).

**53.** When we speak of a public trust, we mean the consistent recognition that such materials are infused with a public interest for all of the reasons outlined above, *see* pp. 348–354 *supra,* and that if the President is to exercise control over their disposition, he does so as a "public trustee," *cf.* Freund, *supra* note 27, at 21.

> Franklin Roosevelt . . . inaugurated the idea of depositing the White House files in a special library set up under the National Archives for that purpose. This new practice . . . clearly implied an obligation

denominated as a property interest or otherwise—itself undercuts the reasonableness and force of any privacy expectation that Mr. Nixon would assert in the bulk of the papers. As for the tape recordings, we have no estimate by Mr. Nixon of what percentage of the conversations implicate Mr. Nixon's privacy rights. But recordings made in the offices provided for use by the President must surely relate primarily to the conduct of the presidency. Moreover, insofar as Mr. Nixon has made public certain portions of the tape recordings, *see* p. 345 *supra,* he can no longer claim a privacy right in them. *United States v. Dionisio,* 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Katz v. United States, supra,* 389 U.S. at 351, 88 S.Ct. 507.

Among all of the papers and tape recordings falling within the Act, however, are some papers and materials containing extremely private communications between him and, among others, his wife, his daughters, his physician, lawyer, and clergyman, and his close friends, as well as personal diary dictabelts and his wife's personal files. Nixon Affidavit at 8–12. Segregating those that are private from those that are not private requires rather comprehensive screening, and archivists entrusted with that duty will be required to read or listen to private communications. *See* p. 355 *supra.* Although the fact that private materials comprise only a small fraction of the total may be relevant to the Act's overall reasonableness, it in no way indicates that those private materi-

als do not fully implicate privacy concerns.

This screening process would raise little, if any, constitutional difficulty were the Act wholly prospective in operation. A President who knew he would be subject to such a statute would have the opportunity to file materials to prevent commingling, to prevent retention of some materials, or to take other steps to protect his privacy. If commingling of private and nonprivate materials persisted, it would be difficult to claim that an objection, based on privacy grounds, to archival processing necessary to segregate materials would be reasonable. In this case, however, Congress acted retroactively with respect to Mr. Nixon. Moreover, it acted against a historical background of *de facto* presidential control over the disposition of materials. In the era when presidential libraries have been established by former Presidents, it has been the consistent practice for those Presidents to remove from the White House virtually all the files: the Central Files and all of its component parts except for the relatively insignificant precedent file, *see* note 1 *supra*; any files maintained by the President or his secretary; the non-institutional files of the National Security Council, *see* note 1 *supra*; Affidavit of Jeanne W. Davis at 3; and materials from the files of staff members except those relating to personal activities, Affidavit of William F. Hopkins at 6; Affidavit of John S. D. Eisenhower at 5; Deposition of Jack Nesbitt at 69–70. The only files left behind are the precedent file of the Cen-

[on the part of the President to give his papers to the nation] and an overriding public interest in the preservation and orderly opening of the White House files. Schlesinger, *supra* note 14, at 178. President Eisenhower's son John, who had substantial responsibility for the disposition of his father's papers, expressed much the same sentiment, indicating that his father "felt that the presidential papers ultimately belong to the public . . . ." *Hearings on H.R. 16902 before the Subcomm. on Printing of the House Comm. on House Administration,* 93d Cong., 2d Sess., at 77 (1974). President Johnson shared that view:

It has long been my belief that the papers and other historical materials of a President constitute a vital part of our Nation's historical heritage and that such papers and materials should be permanently preserved and made available for scholarly research and study. Affidavit of Richard A. Jacobs, exh. I. *See also* p. 50 *supra* (statement of Harry S. Truman); Letter of January 19, 1953 from Jess Larson, Administrator of GSA, to Harry S. Truman, *reprinted* as exh. C to Affidavit of Richard A. Jacobs ("I have long been aware that you consider the possession of these papers a public trust . . . ").

tral Files; the card file of the Records Office, see note 1 supra; and the files of the Administrative Office, see id. It was the common assumption of those familiar with this practice that each President would follow it. McDonough, supra note 34, at 2–4; Hoxie, Who Owns Presidential Papers?, 27 Manuscripts 6, 10 (1975).

 Although every President who has established a presidential library has requested and obtained the assignment of archivists to screen materials, Affidavit of Richard A. Jacobs at 8–9, some of which undoubtedly were private in nature, see sources cited note 33 supra, these Presidents or their designees have removed some items from the screening process, either by excluding them from the scope of the deposited materials or by placing them on deposit but forbidding their even being screened. On the whole, such exclusions have involved materials private in nature, often relating to personal and financial aspects of family relations.[54] Moreover, if other private materials were not excluded from review in the past, that might demonstrate little more than that past Presidents chose not to protect fully their privacy rights, a choice not necessarily binding upon Mr. Nixon. Regardless of the state of title to the materials in question—an issue we do not reach[55] —we believe that the manner in which such materials have been treated by past Presidents, together with the legislative approval of such treatment, see V. Treacy, Ownership of Presidential Papers,

**54.** The record does not clearly indicate whether President Hoover actually excluded any materials from the scope of his gift, although his offer to deposit materials in a presidential library reserved the right to exclude from the deposit personal and private materials. Affidavit of Richard A. Jacobs, exh. A. President Roosevelt indicated his intention to go through his papers and select those that were to be retained by his family. Because of his death, this function was to be performed instead by designated individuals. See Affidavit of William R. Emerson, July 22, 1975, exh. A. Roosevelt's personal secretary "worked with" his personal file for several months before it was turned over to the library, Affidavit of William J. Hopkins at 9, and the record is uncertain as to how many documents she may have removed. A number of personal documents that were deemed to be personal family correspondence were turned over to the Roosevelt family by the Library in 1948, later returned to the Library in 1954–55, and have been on loan to the family since then; it is unclear to what extent this correspondence was reviewed by library personnel. Letter of July 23, 1975 from William R. Emerson, Director of the Roosevelt Library, to R. Stan Mortenson, at 3.

President Truman withheld from deposit the personal file maintained in the White House by his personal secretary; upon his death in 1974, this file was turned over to the library, although the terms of the will excluded a small number of items determined by the executors of his will to pertain to the business or personal affairs of the Truman family. Letter of July 23, 1975 from Benedict K. Zobrist, Director of the Truman Library, to R. Stan Mortenson, at 1, 2–3; Whistle Stop: The Harry S. Truman Library Institute Newsletter, Vol. 3, No. 2, Spring, 1975, at 3. President Eisenhower's offer to deposit his presidential materials excluded those materials determined by him or his representative to be personal or private, Affidavit of Richard A. Jacobs, exh. F, and President Eisenhower reviewed materials in files whose possession he retained after leaving office, Affidavit of John S. D. Eisenhower at 6. The presidential materials of John F. Kennedy deposited with GSA did not include certain objects and documents relating to his private affairs. Letter of July 23, 1975 from Dan H. Fenn, Jr., Director of the Kennedy Library, to R. Stan Mortenson, at 3. There are also 68 dictabelts of telephone conversations, and 125 magnetic tapes of meetings involving President Kennedy, which are or have been physically stored in the Kennedy Library but have not yet been turned over to the library or reviewed by archivists. Letter of August 12, 1975 from David J. Anderson to R. Stan Mortenson, at 5. President Johnson's offer of deposit excluded items which he determined to be of special or private interest to personal or family affairs. Affidavit of Richard A. Jacobs, exh. I.

**55.** We need not reach this issue because we believe that plaintiff's reasonable expectation of privacy is adequately established by the practice of de facto control of presidential materials by former Presidents. That expectation does not depend upon whatever implications, if any, that practice has for the question of ownership, nor would plaintiff's Fourth (or First) Amendment claim be stronger were we to hold that the materials at issue were his property.

We have already indicated that the ownership of the papers does not affect the existence of congressional authority to regulate their disposition. See note 49 supra.

Sept. 24, 1974 (Library of Cong., Cong. Rsch.Serv.); 43 Op.Att'y Gen. No. 1, at 3–5 (Sept. 6, 1974), gave rise to a legitimate expectation on Mr. Nixon's part that not all of the materials would be subject to comprehensive review by government personnel without his consent. *See* 120 Cong.Rec. S 16871 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); Nixon Affidavit at 17, 19. Whether this intrusion on privacy interests is called just that or is considered a search and seizure, it constitutes the central issue in adjudicating plaintiff's privacy claim.

 We do not believe the Fourth Amendment's warrant requirement is applicable to this case,[56] and hence the

---

**56.** None of the parties has given much consideration to this aspect of plaintiff's search and seizure claim, an inattention that we believe reflects the inapplicability of that requirement to this case. We have difficulty fitting this case within the normal rule that, absent a recognized exception, a warrant must be obtained regardless of the reasonableness of the search. That difficulty may be due in part to the consideration and approval by Congress of the very search contemplated under the Act. It may also be attributable to the judicial safeguards available to Mr. Nixon prior to the infringement of protected interests. The materials in question were in government custody pursuant to the Nixon-Sampson agreement before this Act was passed. Although that custody has not adhered to the agreement's terms, the deviations are attributable to court orders issued in the consolidated cases, before this suit was brought or the Act was passed. *See* note 10 *supra.* Plaintiff in this proceeding has the opportunity to challenge the Act's facial validity before he has been harmed in any way by the Act's operation. *See* also note 23 *supra.* In these special circumstances, we have trouble finding the warrant requirement to be applicable.

Even assuming its applicability, we have no difficulty upholding the legality of a "warrantless search" in this case. In a series of cases involving so-called administrative searches, the Supreme Court has not uniformly required warrants to be obtained. *See United States v. Biswell,* 406 U.S. 311, 316–17, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Indeed, in the only case involving a statutory scheme in which searches did not help to enforce criminal laws—a characteristic that the regulations may emulate, *but see* note 61 *infra* or, if necessary, be required by judicial review to emulate—the Supreme Court held that a warrant was unnecessary. *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). The *Wyman* court distinguished earlier decisions requiring warrants for housing inspection searches, *see See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), on the ground that in those cases criminal sanctions were available—either if an individual refused to consent to a search or if a search revealed housing code violations that were not properly remedied. 400 U.S. at 324–25, 91 S.Ct. 381; *see Camara v. Municipal Court, supra,* at 530–31, 533, 87 S.Ct. 1727.

A distinction between civil and criminal searches finds support not only in decided cases but also in the Fourth Amendment's language and values. The amendment contains two clauses, one prohibiting unreasonable searches and seizures and one requiring that warrants be issued only upon probable cause. Reconciliation of the two clauses has proved to be a central problem in the development of Fourth Amendment law. *E. g., Coolidge v. New Hampshire,* 403 U.S. 443, 492, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (Harlan, J., concurring); *id.* at 510–12, 91 S.Ct. 2022 (White, J., dissenting); T. Taylor, Two Studies in Constitutional Interpretation 23–44 (1969); White, *The Fourth Amendment as a Way of Talking About People: A Study of Robinson and Matlock,* 1974 Sup.Ct.Rev. 165, 172–73, and sources cited. The distinction outlined above would achieve reconciliation by suggesting, as a guide rather than a rule, that a particularized showing of probable cause must ordinarily be made in cases involving criminal investigation (the warrant clause), but a more generalized showing of reasonableness, without a warrant, may suffice for noncriminal cases (the reasonableness clause). *Id.* at 178–80.

The distinction would also find support in the function that a magistrate can serve. In a criminal case, the magistrate can evaluate the particular facts to determine the probability that an offense has been committed and evidence thereof may be found at a specified location—a determination limited in scope and not in any way alien to the judicial function. *See* LaFave, *Administrative Searches and the Fourth Amendment,* 1967 Sup.Ct.Rev. 1, 23–24. Where searches further broad legislative policies by their cumulative contribution to those ends, each being of little value but many being necessary to promote such ends, the competence of magistrates in reviewing such judgments is surely open to question. *Cf., e. g.,* Cox, *supra,* at 1429; Freund, *supra* note 27, at 38; Sofaer, *supra,* at 292–94. Here the var-

only touchstone of the legality of a search and seizure is its reasonableness. *See, e. g., United States v. United States District Court,* 407 U.S. 297, 309, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Terry v. Ohio,* 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Camara v. Municipal Court,* 387 U.S. 523, 534–39, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). There is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Id.; accord, e. g., Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868, at 1879. The problem before us is how to interpret the reasonableness requirement when facing materials which (1) for the most part are not private and are related to congressional purposes, (2) include items that are personal and private and/or unrelated to those purposes, and (3) are impossible to segregate other than by reviewing all of them.

ious purposes subsumed under the rubric of preservation of the historical record of the Nixon presidency can be served only by a comprehensive review process designed to preserve the whole record; isolated bits and pieces are of little value except as parts of a larger picture. Determining the review process necessary to further these ends is a judgment legislative in nature, and one of which judicial review is unlikely to be effective.

It is of course true that in *Camara* the Court required a warrant procedure to review such a legislative kind of judgment. But that case is different from this one in several important respects. First, as noted above, there was a genuine possibility that the search would lead to the imposition of criminal sanctions. Second, if the warrant requirement there made any sense, a question open to some doubt, *see* LaFave, *supra,* at 27, it was to "diminish the chance of an inspection 'based on caprice or on personal spite' or as 'a front for the police,' " LaFave, *"Case-by-Case Adjudication" Versus "Standardization Procedures": The Robinson Dilemma,* 1974 Sup.Ct.Rev. 127, 153, *quoting Ohio ex rel. Eaton v. Price,* 364 U.S. 263, 271, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960), *and Abel v. United States,* 362 U.S. 217, 242, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Here, however, where a comprehensive one-time screening process is contemplated, it is difficult to see how even that function could be served. The scope of the intrusion is presently clear in its broadest outline, and will be made clearer by regulation. There is little possibility that government officials will abuse their discretion in the screening as it will be prescribed by the Act, for that discretion, in terms of the scope of the processing, will be quite broad. Nor, for the same reason, would a warrant procedure enforce particularity in the search. Another purpose of the requirement—limiting the possibility of entry by a criminal into private homes under the guise of official authority—is also inapposite. And finally, since regulations promulgated may prohibit use of evidence gained from the screening process, we need not now worry about the possibility of archivists' acting as a front for the police. Where a one-time search takes place according to pre-scribed statutory and administrative standards; where those standards themselves are reasonable; and where a warrant sufficiently flexible to accommodate reasonable intrusions provides protection that is wholly illusory, insistence upon compliance with the warrant requirement in a purely "civil" case would exalt form over substance. *See United States v. Biswell, supra,* 406 U.S. at 316, 92 S.Ct. 1593.

Finally, a distinction between civil and criminal searches finds support in the notion that the Fourth Amendment is directed not simply against invasions of privacy but also against the use in the criminal process of evidence obtained through such abuses. *See Camara v. Municipal Court, supra,* 387 U.S. at 530–31, 87 S.Ct. 1727 (by implication); White, *supra,* at 180. Such a notion is closely related to a value that has long been associated with the exclusionary rule: the preservation of judicial integrity by refusing to sanction illegal police practices by admitting the fruits of such illegality in trial. *See United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 2317–18, 45 L.Ed.2d 374 (1975); *id.* at 2324–27 (Brennan, J., dissenting); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975); *id.* at 2264–65 (Powell, J., concurring). Although the importance ascribed to this purpose, as compared with the deterrent purpose, of the exclusionary rule, has varied over time, *see, e. g.,* Monaghan, *The Supreme Court, 1974 Term —Foreword: Constitutional Common Law,* 89 Harv.L.Rev. 1, 3–10 (1975); *compare, e. g., Calandra v. United States,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), *with, e. g., id.* at 355–67, 94 S.Ct. 613 (Brennan, J., dissenting); *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting); *id.* at 470, 48 S.Ct. 564 (Holmes, J., dissenting); *Weeks v. United States,* 232 U.S. 383, 391–92, 394, 34 S.Ct. 341, 58 L.Ed. 652 (1914), there appears to be little doubt that Fourth Amendment values are invaded more substantially when not only is privacy infringed, but the result of that infringement is the use of the fruits of the illegality at a criminal trial.

■ We believe that the precedents upholding the legality of electronic surveillance conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1970), argue forcefully for finding that the Act before us does not unconstitutionally infringe plaintiff's privacy. It is true, of course, that the provisions of Title III govern searches primarily designed to investigate criminal violations, a quite different emphasis from that of this Act; but, as we note below, that difference only strengthens our conclusion that the Act does not violate any privacy rights. Electronic surveillance of wire communications involves interception of conversations (1) some of which are expected to be related to law enforcement, (2) some of which are not, and (3) for which there is no available means to segregate the one from the other except by reviewing them all.[57] Thus, such surveillance, like the processing involved under this Act, necessarily contemplates intrusions into communications that may be both unconnected to legitimate government objectives and intensely private. If that fact alone were thought sufficient to render surveillance unconstitutional, then law enforcement officials would be foreclosed from ever employing that technique. No court has reached such a conclusion. Instead, every one of the ten circuits that have ruled upon the question has upheld the legality of surveillance conducted according to the scheme of the Omnibus Act. *Turner v. United States,* 528 F.2d 143, 158–159 (9th Cir. July 24, 1975); *United States v. Sklaroff,* 506 F.2d 837, 840 (5th Cir.) *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); *United States v. Ramsey,* 503 F.2d 524, 526–31 (7th Cir. 1974), *cert. denied,* 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975); *United States v. Martinez,* 498 F.2d 464, 467–68 (6th Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d 654 (1974); *United States v. James,* 161 U.S.App. D.C. 88, 494 F.2d 1007, 1012–13 (1974); *United States v. Tortorello,* 480 F.2d 764,

---

We by no means suggest that warrants are never required in civil cases, but rather that in some civil cases the nature of the statutory purpose, and the relation of the magistrate's function to that purpose, make such a requirement inappropriate. When important interests are at stake which could not be furthered without permitting broad searches based on legislative standards rather than a particularized showing, *see United States v. Biswell, supra,* 406 U.S. at 315–16, 92 S.Ct. 1593; when judicial intervention serves no genuine function, *id.* at 316, 92 S.Ct. 1593; and when criminal consequences will not flow from the search, then we believe it may be and, in this case, is improper to apply the warrant requirement.

**57.** This problem is not unique to electronic surveillance or the screening to be done under this Act; rather, it may exist whenever a search is made for documentary evidence that is intermingled with other material unrelated to the purpose of the search. It is instructive to note that the congressional scheme before us is in some respects very similar to the procedure prescribed by the ALI Model Code of Pre-Arraignment Procedure (Official Draft, Approved May, 1975) for dealing with intermingled documents. Under the Code, documents that "cannot be searched for or identified without examining the contents of other documents" shall be impounded by the seizing officer. § SS 220.5(2). After a judicial hearing, an order is issued to specify the conditions and limitations upon any search of the documents' contents. § SS 220.5(3). The purpose of this order, as relevant to this case, is to prevent an excessive intrusion on privacy by providing such safeguards as permitting a party to show that certain portions of the seized materials could not contain the items sought, *see* p. 29 & note 22 *supra,* to have counsel present, and to request that a special master rather than police do the searching. § SS 220.5, Note.

Thus under the Code, materials initially are merely seized and taken into custody, as they have been under the Act. More detailed processing awaits consideration in a hearing possibly leading to the imposition of particular limitations, as under the Act processing awaits particularized consideration under the regulations with judicial review available before any further search begins. Processing may be done not by law enforcement officials but by judicially-appointed individuals, just as under the Act screening will be done by skilled, discreet, and professional archival personnel. These similarities reinforce our view that the processing scheme contemplated by the Act is an appropriate and legal one.

771–75 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *United States v. Bobo,* 477 F.2d 974, 978–82 (4th Cir. 1973), *cert. denied sub. nom. Gray v. United States,* 421 U.S. 909, 95 S.Ct. 1557, 43 S.Ct. 774 (1975); *United States v. Cafero,* 473 F.2d 489, 493–501 (3d Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974); *United States v. Cox,* 462 F.2d 1293, 1302–04 (8th Cir. 1972); *United States v. Cox,* 449 F.2d 679, 683–87 (10th Cir. 1971), *cert. denied,* 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).

Of course, that scheme requires that a variety of standards and procedures be met before surveillance may be employed. Although the parallel is not, of course, perfect, we believe that this Act does not on its face deviate from those standards and procedures in their principal aspects. For example, under the Omnibus Act, surveillance can be conducted to investigate only designated crimes that are serious in nature, 18 U.S.C. § 2516 (1970), and only when normal investigative procedures have failed or would be likely to do so, *id.* § 2518(3)(c). Here, we have a processing scheme without which national interests of overriding importance cannot be served, *see* pp. 348–355 *supra,* and hence, in terms of the seriousness of the need and the inability to employ potentially less restrictive means, the Act conforms to the spirit of the Omnibus Act. The Omnibus Act also requires that the interception of the communication be minimized. 18 U.S.C. § 2518(5); *see, e. g., United States v. Scott,* 516 F.2d 751 (D.C. Cir. 1975); *United States v. James, supra.* Although the Act before us does not so require in its statutory provisions, as we indicated above, *see* p. 361 *supra,* the scheme under which the materials will be processed could properly follow such a practice, as well as other practices designed to protect Mr. Nixon's privacy

to the maximum extent possible. Thus, we believe the question of the Act's facial validity falls within the precedents upholding the constitutionality of Title III.[58]

Furthermore, there are other factors that suggest that any invasion of legitimate expectations of privacy is entirely reasonable. Whether regarded as making the legality of this Act even clearer than the legality of electronic surveillance or as providing an independent line of argument that the Act is valid, we believe these factors indicate that Mr. Nixon's privacy claim cannot be sustained. First, the percentage of documents and conversations in which plaintiff has no reasonable privacy expectation, although it cannot be estimated with precision, appears to be extremely high. A comparison to the Omnibus Act is instructive. If we assume that all 200,000 of the documents Mr. Nixon saw, and no others, implicate his privacy interests (assumptions that may both be somewhat inaccurate, but whose inaccuracies are offsetting, and which on balance do not seem ungenerous to Mr. Nixon's claim), a very large fraction of the 42,000,000 pages of documents would appear to be nonprivate, and it appears that a very high percentage of them would be related to government interests served by the Act. The ratio of conversations on the 880 tape recordings, although less certain and perhaps lower, is most likely also quite high. By contrast, the most recent report on surveillance conducted pursuant to the Omnibus Act indicates that for the calendar year 1974, the overall average percentage of incriminating intercepts to total intercepts per authorizing order was just over 50%. Administrative Office of the United States Courts, Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications, January 1, 1974 to December 31,

---

**58.** It is true that Title III, unlike the Act, also requires adherence to a warrant requirement detailed with some specificity in 18 U.S.C. § 2518 (1970). We believe, however, that the Fourth Amendment's warrant requirement is inapplicable to the situation before us, in part because it would serve little purpose, *see* note 56 *supra,* and hence this distinction between the two statutory schemes is unimportant for our purposes.

1974, at X (Table 4). Particular wiretaps resulted in interceptions none, or only a very small percentage, of which were related to government law enforcement objectives. *Id.* at 2–11 (Table A–1), 23–70 (Table B–1). Even if we were to assume that some of the interceptions included in these figures were illegal and hence, the figures should be somewhat higher, nonetheless, the percentage of total intrusions related to statutory objectives appears to be strikingly higher under the Act before us than is true especially of individual instances of electronic surveillance, but also of such surveillance considered on average. The fact that only a small fraction of the vast number of materials here at issue seem likely to implicate Mr. Nixon's privacy suggests the reasonableness of the screening process contemplated by the Act.

Second, the infringement of privacy caused by review by archivists with an unblemished record for discretion, *see* p. 347 *supra*, is less wide-ranging than that resulting from ordinary criminal investigation whose purpose is use of evidence at trials exposed to the public.[59] Indeed, although Mr. Nixon might, had he carried out his stated intention to establish a presidential library, have removed some of the most private materials before deposit, it seems unlikely that he, unlike his predecessors, would have had the time or the inclination to attempt to remove all documents implicating his privacy. *See* pp. 346–347 *supra.* Thus, we suspect that he contemplated permitting archivists to review materials in which he had a reasonable expectation of privacy. That would not, of course, operate to defeat his expectation. However, we do believe it helps to indicate that, in the special situation of documents accumulated by a President during his tenure and reviewed by professional government personnel, pursuant to a process employed by past Presidents, any intrusion into privacy interests is less substantial than it might appear at first.[60] *Cf. United States v. Nix-*

---

**59.** Plaintiff's brief makes frequent reference to the staff of 100 archivists who will be engaged to process the materials, *see Senate Hearings on GSA Regulations* at 4. The need for so large a staff arises from the enormous quantity of materials at issue. However, the figure of 100 archivists should not be taken to suggest that each document or conversation will be reviewed by all 100. Rather, we suspect that the processing scheme finally adopted—like the one that GSA has currently proposed—will ordinarily contemplate only one individual's screening any particular item, and when in difficult cases guidance is needed or administrative appeals are taken, there would still be only several, rather than five score, archivists involved. *See generally* Proposed Regulations, *supra* note 13, § 105–63.401–2.

**60.** In his Reply Brief at 56, plaintiff insists that there is a

seemingly obvious difference between review of materials by persons—be they archivists or not—acting under and responsible to the owner of the papers, and review by persons acting under directions of and responsible to a suspicious and hostile Congress and cowed executive officials.

This argument proves little to us except that what may be obvious to one person is not obvious to others. It is difficult to see how archivists, charged with the difficult and delicate task of screening materials with an eye

toward historical value, protection of individual rights, and the classificatory needs of a documentary library, have a great deal of leeway in the performance of their duties for loyalty to individuals or institutions. So long as the standards defining the categories into which various materials are placed are proper, we see no reason to find improper the implementation of those standards by archivists whose record is a tribute to their profession, merely because particular personnel were selected by GSA rather than by Mr. Nixon.

Although in his Affidavit at 19, Mr. Nixon asserts that Presidents Truman, Eisenhower, and Johnson assisted in the selection of archivists to review files, the evidence in the record does not clearly establish whether that assertion is accurate. The record is most complete with respect to Lyndon Johnson, who appears to have recommended the individual who was later selected as Director of the Johnson Library but seems not to have played any role in the selection of the archivists actually performing the day-by-day processing. *See* Affidavit of Harry J. Middleton at 2; Letter of Aug. 12, 1975 from David J. Anderson to R. Stan Mortenson, at 2. It also appears that a committee of individuals designated by Herbert Hoover had a voice in the selection of Directors of the Hoover Library, Affidavit of Richard A. Jacobs at 3–4, and that Harry Truman expected to have some voice in selecting two archivists assigned to him immediately

on, *supra,* 418 U.S. at 706, 94 S.Ct. at 3107 (stating, in the context of executive privilege rather than right to privacy, that "we find it difficult to accept the argument that even the very important interest in confidentiality of presidential communications is significantly diminished by production of such material for *in camera* inspection with all the protection that a district court will be obliged to provide"); *Sun Oil Co. v. United States, supra,* 514 F.2d at 1024. *See also* note 57 *supra.*

██ Third, it is possible that the regulations will expressly prohibit use in criminal investigation and prosecution of any information derived from archival processing. That possibility is far more than chimerical in light of the Special Prosecutor's having indicated he has obtained all evidence needed for his investigations.[61] *See* note 11 *supra.* In any event, such a prohibition could be imposed through judicial review of regulations were it thought to be constitutionally compelled. *See also* note 18 *supra.* The protections of the Fourth Amendment, of course, apply to searches that are unconnected to enforcement of criminal laws. *See, e. g., Camara v. Municipal Court, supra,* 387 U.S. at 530–31, 87 S.Ct. 1727. But there is considerable authority for the proposition that a less strict and particularized government showing is necessary to comply with the Fourth Amendment's reasonableness requirement when the search is entirely "civil" in nature. *See, e. g., Almeida-Sanchez v. United States,* 413 U.S. 266, 278–79, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring); *Wyman v. James,* 400 U.S. 309, 321, 323–24, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971); *id.* at 344 n.4, 91 S.Ct. 381 (Marshall, J., dissenting) (by implication); *Camara v. Municipal Court, supra,* 387 U.S. at 530–31, 533, 537–38, 87 S.Ct. 1727; White, *supra* note 56, at 178–80; Testimony of Attorney General Edward H. Levi before the Senate Select Comm. to Study Governmental Operations with respect to Intelligence Activities, Nov. 6, 1975, at 24–25, 32–35, 41–44.[62] *See also* note 56 *supra.* This authority also lends weight to the conclusion that any invasion of privacy interests—that is, any search and seizure—contemplated by the Act is reasonable.[63]

---

after he left office, *id.,* exhs. B, C, although it is unclear to what extent, if any, he ultimately participated in selection.

Mr. Nixon's real objection may be that the standards according to which materials are categorized are established by GSA rather than by him, an allocation of responsibility that we have already found to be justified. *See* pp. 347–348 *supra.* We also note that GSA, whether or not required to do so by regulation, *see* pp. 339–340 *supra,* might give Mr. Nixon some voice in the selection of personnel.

**61.** We recognize, of course, that the Proposed Regulations, *supra* note 13, require archivists to bring to the attention of the Administrator, for referral to law enforcement officials, materials reflecting an apparent violation of the law. § 105–63.401–2(d). We reiterate, however, that until these regulations have lain before Congress for ninety legislative days, they have no legal force, and during that period are subject to disapproval by either House and perhaps to amendment by GSA itself.

**62.** It might be suggested that such authority confuses rights and remedies; searches may unreasonably intrude upon privacy regardless of the use of any evidence obtained. We do not believe such an objection to be well-founded. Though it is beyond doubt that some searches are unreasonable merely because of their initial intrusive effect, the overall impact on an individual's privacy and security depends upon whether the government's motive is hostile or benign, the scope of any subsequent disclosure of private materials, and the harshness of any consequences that might follow. *See* Testimony of Attorney General Edward H. Levi, *supra,* at 43–44; note 56 *supra.*

**63.** Mr. Nixon relies heavily upon *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), as support for his privacy claim. *Stanford* involved a search designed to obtain evidence that an individual had violated a "many-faceted law which, among other things, outlaws the Communist Party and creates various individual criminal offenses, each punishable by imprisonment for up to 20 years." *Id.* at 477, 85 S.Ct. at 507. The search warrant, which the Court assumed to be issued upon probable cause, purported to authorize a search of private premises for books, records, and other materials concerning illegal Commu-

We would be less than candid were we to state that we find it as easy to dispose of Mr. Nixon's privacy claims as his claim of presidential privilege. But on balance, we believe that the congressional act here is a reasonable response to the difficult problem caused by the mingling of personal and private documents and conversations in the midst of a vastly greater number of nonprivate documents and materials related to government objectives. The processing contemplated by the Act—at least as narrowed by carefully tailored regulations—represents the least intrusive manner in which to provide an adequate level of promotion of government interests of overriding importance. *See United States v. Biswell,* 406 U.S. 311, 315–16, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Camara v. Municipal Court, supra,* 387 U.S. at 535–36, 87 S.Ct. 1727 (1967); La-Fave, *Administrative Searches and the Fourth Amendment,* 1967 Sup.Ct.Rev. 1, 14–17. Although the invasion of Mr. Nixon's privacy from processing, even by discreet and professional government archivists, of all of the materials at issue is not insignificant, we do believe, in light of the special circumstances before us in this case, that it is not unreasonable and hence does not call into question the facial constitutionality of the Act. Hence, we find plaintiff's claim to be without merit.[64]

## V. FREEDOM OF SPEECH AND ASSOCIATION

Mr. Nixon asserts that the Act denies him the protection of expressive activity guaranteed by the First Amendment. The argument is cast in a variety of forms. It is alleged that the Act invades the private formulation of political thought critical to free speech and asso-

nist activities. Several officers spent more than four hours gathering about half the books they found in Stanford's house, and those seized included works of Sartre, Marx, Pope John XXIII, Justice Hugo Black, Theodore Draper, and Earl Browder, as well as private documents including a marriage certificate, insurance policies, household bills and receipts, and personal correspondence. *Id.* at 479–80, 85 S.Ct. 506. The Court held this to be an unconstitutional general search, noting also that special care in protecting Fourth Amendment rights is appropriate when the things to be seized are books and the basis for their seizure is their content. *Id.* at 485, 85 S.Ct. 506.

Although the concern for limiting government intrusions where First and Fourth Amendment protections coalesce is an important one, we do not believe *Stanford* to be in any way controlling. First, the seizures in that case were enormously overbroad, encompassing material whose seizure was plainly unrelated to any legitimate government objectives. That is not the case as respects the comprehensive screening process necessary here to further a variety of valid legislative objectives. Second, the law enforcement officials made no attempt, in either procuring or executing the warrant, to minimize the intrusion, a possibility that may occur, either through force of regulation or as a matter of archival practice, under the Act. *See* p. 364 *supra.* Third, the search in *Stanford* intruded upon all of an individual's personal papers maintained in his private home in the hopes of finding a few pieces of incriminating evidence, as compared to screening millions of pages of presidential materials not implicating privacy concerns and related to government objectives and, as an inescapable concomitant of that process, reviewing the small fraction of the materials that is private. Fourth, the very purpose of the search in *Stanford* was to enforce criminal laws, a purpose that is not central and might even be prohibited under this Act. Finally, although the *Stanford* Court was not required to reach the question of the constitutionality of the state statute involved, it may well have been influenced by the belief that government investigation or prosecution of suspected Communists, if not unconstitutional under the First Amendment, was at the very least not an admirable spectacle.

**64.** Plaintiff also claims to be able to assert the constitutional rights of third parties whose privacy interests may be invaded by processing under the Act. He does not indicate why it is that he should be able to assert these third party rights, *see generally* Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv.L. Rev. 423 (1974), but we do not believe that we must face the sometimes tricky issue of standing. *Cf. Ripon Soc'y v. National Repub. Party,* 525 F.2d 567, at 578 n. 28 (D.C. Cir. 1975) (en banc). For even were we to assume *arguendo* that such an assertion was appropriate, we would find that the infringement of any other individual's privacy to be far less global and equally well-justified so as to be an *a fortiori* case.

ciation, imposing sanctions upon past expressive activity, and more significantly, limiting that of the future because individuals who learn the substance of certain private communications by Mr. Nixon—especially those critical of themselves—will refuse to associate with him. The Act is furthermore said to chill Mr. Nixon's expression because he will be "saddled" with prior positions communicated in private, leaving him unable to take inconsistent positions in the future. Finally, the example of the Act, plaintiff asserts, will limit free expression by and to political figures in the future. Although these arguments vary somewhat in content as well as in coherence and plausibility, it should be clear that the gravamen of each of them is the harm to Mr. Nixon's First Amendment interests caused by disclosure of the materials so as to violate his associational privacy.

 It is undisputed that the First Amendment's protection of freedom of expression encompasses association for the advancement of political ideas. *E. g., Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Bates v. Little Rock,* 361 U.S. 516, 522–23, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460–62, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462, 78 S.Ct. at 1172. Where an infringement of associational freedom can be shown, the government bears the burden of showing that the action it defends serves a compelling government interest that cannot be promoted in a less restrictive way. *E. g., Kusper v. Pontikes, supra,* 414 U.S. at 58–59, 94 S.Ct. 303; *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Shelton v.*

*Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Mr. Nixon invokes this established First Amendment doctrine in pressing his claim.

 This contention is in its structure not very different from the Fourth Amendment question we have just discussed. It too is limited to the constitutionality of a screening process necessary to classify and categorize materials only some of which implicate Mr. Nixon's constitutionally protected interest in associational privacy. There are, undoubtedly, some materials mingled among the great bulk that truly implicate Mr. Nixon's ability to associate in private in order to advance political ideas, and the fraction of these as compared to the total is unlikely to differ substantially in size from that fraction implicating his Fourth Amendment interests. *See* pp. 358–359 *supra.* Here, too, Mr. Nixon may have in effect waived his right to invoke freedom of association with respect to certain portions of the materials which he earlier disclosed. *Cf.* pp. 345–359 *supra.* And although the great bulk of the materials appear to be unrelated to Mr. Nixon's constitutional interests, he appears to have a legitimate expectation that he would have an opportunity to remove some of the sensitive political documents before any government screening took place. *See* pp. 360–361 *supra.*

 The allegations of infringement of rights here, however, are predicated on the assumption that all materials will be opened to public access without any protection of plaintiff's constitutional interest in, *inter alia,* associational privacy. *See* Plaintiff's Brief at 144, 149, 150–52; Reply Brief at 60–62. This is an assumption, as noted above, which we have no reason to accept or to base a ruling upon.[65] Hence, we need not resolve the

---

**65.** The Proposed Regulations, *supra* note 13, mandate restrictions on public access to materials implicating "personal privacy." *See* note 52 *supra.* We believe that it is entirely possible to read personal privacy so as to include the privacy in political association protected

by the First Amendment, and, if this were the case, then these regulations would be inconsistent with plaintiff's assumption.

The intervenor-defendants include journalists whose interest would seem to lie in the broadest immediate disclosure of all materials

debate between plaintiff, on the one hand, and defendants and any intervenor-defendants, on the other, as to whether the kinds of burdens Mr. Nixon alleges are cognizable and not excessively speculative. For we believe that any burden arising solely from review by professional and discreet archivists is not significant, and certainly not significant enough to outweigh countervailing government interests. Mr. Nixon's freedom to continue to express himself on public issues will not be impaired if a handful of government archivists privately know the contents of materials in which plaintiff may or may not have taken inconsistent positions. Similarly, that private knowledge of archivists will not deter individuals with whom Mr. Nixon has associated (or would like to associate) from participating with him in political activities. For these reasons, we do not believe that the Act will in any significant way chill association by or with future presidents. *Cf.* pp. 345–347 *supra.* Finally, there is no showing here of the kinds of sanctions, coercion, harassment, or other oppression that characterized such cases as *NAACP v. Alabama ex rel. Patterson, supra,* 357 U.S. at 462, 78 S.Ct. 1163, and *Bates v. Little Rock, supra,* 361 U.S. at 523–24, 80 S.Ct. 412, in which the doctrine of associational freedom was first developed, and that more recently were accorded considerable significance by another three-judge court in this district, *see* Order of October 22, 1975 in *Doe v. Martin,* 404 F.Supp. 753, 755–762. Rather, this case is not unlike *Buckley v. Valeo, supra,* where the court of appeals in this circuit considered whether auditing provisions of the Federal Election Campaign Act that authorize the Federal Election Commission to inspect but not to disclose confidential records of political contributions violate the First Amendment. The court there held that "the confidential status of those records precludes any claim of real or threatened injury to plaintiffs' First Amendment interests arising from public disclosure." 519 F.2d at 865. Plainly put, plaintiff has provided us with no reason to believe that screening by government personnel, by itself, undermines his First Amendment freedoms. *See also California Bankers Ass'n v. Shultz,* 416 U.S. 21, 51–52, 56–57, 94 S.Ct. 1494, 89 L.Ed.2d 812 (1974). And since, as was noted earlier, the Act is a legitimate and not unnecessarily restrictive means of furthering government interests of great importance, we find no basis whatsoever for upholding Mr. Nixon's challenge to the Act on First Amendment grounds.[66]

## VI. EQUAL PROTECTION

Mr. Nixon challenges the Act on the ground that, by singling out the papers accumulated during his tenure in

---

of interest to the reading public. Yet at the oral argument on the merits of this case, certain of their counsel conceded that some materials would fall within the protection of the First Amendment. Mr. Herzstein suggested three possible meanings of "political materials": first, those relating to the abuse of government power for political purposes; second, those relating to the exercise of political influence and national leadership in the national interest as perceived by the Chief Executive; and third, truly personal political activity. Transcript at 71–72. The record proceeds as follows:

Mr. Herzstein: . . . If Mr. Nixon was a member of the ACLU or the John Birch Society or the Republican Party, his personal involvement with that organization, to the extent it involved no connection with his use of his public office, then we feel that is a personal record.

Judge McGowan: That could be left out.

Mr. Herzstein: And that could be left out, that's right.

*Id.* at 72. Counsel for another of the groups of intervenors indicated his agreement:

Mr. Friedman: . . .

I would start right out by agreeing that there is some material in this group which would be protected by the First Amendment. Mr. Herzstein referred to personal associations of Mr. Nixon, a list of his own personal political contributions, a list of whom he voted for in his entire life, all of that would be protected by the First Amendment.

*Id.* at 74.

**66.** Insofar as plaintiff purports to assert the rights of third parties, we find such a claim to be without merit, for reasons discussed in note 64 *supra.*

office, it denies him the equal protection of the law. We believe, however, that there is adequate justification for the difference in treatment between him and other Presidents. His papers were in a unique status. Those of his latter-day predecessors in office had already been deposited in presidential libraries, see p. 346 supra, and were, therefore, available (albeit on a restricted basis in some cases) to historians, the public, and the three branches of government. The papers of his successors were yet to come into being or, in the case of President Ford, still in active use by the incumbent administration. Legislating with respect to Mr. Ford might have directly and adversely affected executive policymaking. Cf. p. 344 supra. Legislating with respect to any future President might have been unwise when the considered study by the Commission established by Title II of the Act of the sensitive, complex, and often technical questions relating to government documents had not been completed. See 120 Cong.Rec. S 18244–45 (daily ed. Oct. 3, 1974) (remarks of Sen. Javits); id. at H 11208 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas); id. at H 11212 (statement of Rep. Bingham). Only Mr. Nixon was in the intermediate status of having terminated his service as President but not yet having established a presidential library.

Mr. Nixon has emphasized that the materials would have been preserved for at least three years under the Nixon-Sampson agreement. The implication is that there was no urgent need for immediate governmental control or for singling out plaintiff; during that period, Mr. Nixon might have established a presidential library, making him like past Presidents of the modern era, or the Commission might have finished its work, enabling Congress to apply the same standards to him and to future Presidents. This argument, we believe,

misses the point. The possibility existed that Mr. Nixon and the GSA might decide to amend the agreement so as to foreshorten the three-year period. Even within the course of three years' time, there was no assurance either that Mr. Nixon would plan to establish a presidential library or that the Commission would have completed a study that would be translated into law. Indeed, at this date—over 15 months after the Nixon-Sampson agreement was formed—the Commission's first meeting has just been held, although its report to the President and Congress is to be transmitted no later than March 31, 1976, see 44 U.S. C.A. § 3322 (Supp. I, Feb. 1975). Although Mr. Nixon has asserted that he intends to establish a presidential library at the University of Southern California, see Nixon Affidavit at 19; Affidavit of John R. Hubbard at 1–2, no binding arrangements have yet been made.[67]

In addition, there was a distinct disadvantage to waiting for the completion of the Commission's report: in the interim, no progress could be made in the lengthy process of reviewing, classifying, and housing the materials so that they might become available for a variety of uses. On the assumption that processing could begin in the spring of 1976, GSA estimates that the materials whose review would receive first priority would not be fully processed until the fall of 1979. The first priority materials comprise only 21% of the total, and although the other 79% can be processed more quickly, they would receive no attention, except for initial shelving and arranging, until the 1980s. Senate Hearings on GSA Regulations at 115–19. Similarly, the tape recordings would not be fully processed until the end of 1979. Id. at 132. The examples in the record of requests from a variety of individuals or agencies for access to materials in presidential libraries having to be refused merely be-

67. It is of course understandable that no final arrangements could be made given the uncertainty, generated by the passage of the Act and by this and other litigation, about the nature of Mr. Nixon's rights and interests in the materials. Nonetheless, it is noteworthy that not only were there no binding plans at the time that the Act was passed, but that investigation of the possibility of establishing a library at USC began only after the passage of the Act. See Affidavit of John R. Hubbard at 1.

cause processing had not been completed [68] indicate the importance of beginning the lengthy processing period as promptly as possible, so that access to the materials by the public or by government officials would not be unduly delayed. *See also* notes 41, 45 *supra.*

Finally, as noted above, *see* pp. 347–348 *supra,* Congress had before it an adequate basis for concluding that Mr. Nixon might not be a wholly reliable custodian of the materials at issue. This aspect of the case provides a basis for distinguishing him from other Presidents, whose inclination to serve important public interests in disposing of such materials Congress had less reason to question. It also reinforces the dangers of deferring congressional action in the event that the agreement were amended, or, after three years' time, no satisfactory arrangements for a presidential library existed and the Commission report was not completed or acted upon. We believe that this additional factor makes even clearer what is already apparent, namely, that there was adequate justification for according different treatment to these materials than to those accumulated during other Presidential administrations. *See also* note 35 *supra.*

■ Mr. Nixon also suggests that the Act must be subjected to heightened scrutiny and requires compelling justifications because it infringes his fundamental interest both in free speech and association and in privacy. The first of these interests has already been discussed in its own right, as the protections of the First Amendment apply directly to the case, and we found the infringement of expressive interests to be insubstantial and amply justified. That analysis, we believe, is fully dispositive of any equal protection claim resting upon so-called strict scrutiny. *See, e. g., Police Dept. v. Mosley,* 408 U.S. 92, 94–102, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Kalven, *The Concept of the Public Forum: Cox v. Louisiana,* 1965 Sup.

Ct.Rev. 1, 29–30; *The Supreme Court, 1973 Term,* 88 Harv.L.Rev. 41, 153–55 & nn. 36, 39 (1974). As for the privacy claim, Mr. Nixon provides no authority indicating that the kind of privacy interests whose protection he seeks has heretofore been provided under the equal protection clause, and we know of none; but even if such authority existed we believe once again that the analysis above of the infringement of those interests, as compared to the furtherance of important legislative objectives, disposes of his claim.

### VII. BILL OF PAINS AND PENALTIES

■ Article I, section 9, clause 3 of the Constitution prohibits the legislature from enacting a bill of attainder, which is a legislative determination of guilt and imposition of punishment upon a specified group or specified individuals without the safeguards of a judicial trial. *E. g., United States v. Brown,* 381 U.S. 437, 441–46, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); *id.,* at 462–64, 8 S.Ct. 1707 (White, J., dissenting); *Flemming v. Nestor,* 363 U.S. 603, 613, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); *id.* at 627, 80 S.Ct. 1367 (Black, J., dissenting); *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (plurality opinion); *United States v. Lovett,* 328 U.S. 303, 315–17, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); *id.* at 321–22, 66 S.Ct. 1073 (Frankfurter, J., concurring). Strictly speaking, an act is a bill of attainder when the punishment is death, and a bill of pains and penalties when the punishment is less severe, but both kinds of punishment have been held to fall within the scope of the constitutional prohibition. *E. g., United States v. Lovett, supra,* at 323–24, 66 S.Ct. 1073 (Frankfurter, J., concurring); *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1867).

Plaintiff's argument that the Act is a bill of pains and penalties rests primarily upon the general political atmosphere as-

[68]. *See* Letter of August 12, 1975 from David J. Anderson to R. Stan Mortenson, at 2; Affidavit of Harry J. Middleton at 3–4 & exhs. A, B; Letter of July 23, 1975 from Benedict K. Zo-

brist, Director of the Truman Library, to R. Stan Mortenson, at 1–2; Affidavit of William R. Emerson, July 22, 1975, exh. I.

serted to exist at the time the legislation was passed. As Mr. Nixon describes it, there was a period of great political turbulence during and following "Watergate": congressional inquiries had generated widespread allegations of misconduct; articles of impeachment had been recommended by a House committee; and in the wake of that recommendation there followed a presidential resignation. A presidential pardon granted Mr. Nixon by his successor generated enormous controversy and, on the part of some legislators, anger, frustration, and a determination not to let the pardon prevent airing of the whole Watergate affair to the public. In light of these circumstances, plaintiff asserts that the Act was designed to punish him for the wrongdoing that was alleged, and hence falls within the bill of attainder clause. Plaintiff's Brief at 195–205; Plaintiff's Reply Brief at 63–66.

■ Assuming *arguendo* that this characterization of legislative sentiment is accurate, we believe it falls far short of making out a meritorious bill of attainder claim. Congress may often be angered or frustrated by executive decisions, and may often attempt to bring to the notice of the public information bearing upon allegations of wrongdoing by government officials. Whether or not such congressional activity is likely to represent a wise exercise of legislative power, it is not automatically punitive in character. And when plaintiff moves from asserting the existence of anger and frustration to asserting punitive motivation, he uniformly fails to adduce any evidence from the legislative record or otherwise to support his contention.[69] Surely not any piece of legislation, or any piece of legislation more or less related to "Watergate," that was passed during times that Mr. Nixon asserts were turbulent must be found unconstitutional on bill of attainder grounds. Whether it is depends upon a demonstration of punitive intent or character, and that demonstration is patently lacking here.

■ The test of whether a legislative enactment is punitive in nature has been variously stated. To some extent it has rested upon whether there exist other, non-punitive, purposes that may plausibly be assigned to the legislation, *e. g., Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); *Trop v. Dulles,* 356 U.S. 86, 107–10, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion);[70] *Cummings v. Mis-*

---

**69.** For example, after providing citations to various statements by members of Congress and to newspaper articles designed to support plaintiff's characterization of the political atmosphere, Plaintiff's Brief at 198 shifts to the statement that "[m]any in Congress perceived the legislation as the only way in which they could exact a penalty which they felt was due," without any support whatsoever for that statement. The next sentence, insisting that the Act and the debates preceding its passage indicate a congressional design to inflict punishment upon an *individual thought to be* guilty of criminal acts, stands similarly unsupported. What follows in the brief indicates little more than a legislative desire to obtain the whole truth about Watergate in part because the pardon of Mr. Nixon had prevented criminal proceedings from serving that role, *id.* at 199; this legislative objective is not illegitimate or necessarily punitive, *see* p. 353 & note 16 *supra.* The brief proceeds further by again leaping to a conclusion—that the "tone of anger and the conclusions of guilt" in the debates reveal a punitive purpose, Plaintiff's

Brief at 200, without any support for that allegation. Similarly, a congressional recitation of alleged wrongdoings, *see id.* at 202; Reply Brief at 63–65, can reflect legitimate legislative considerations, *see* pp. 347–348 *supra,* as easily as punitive motivation, and once more plaintiff fails to document or demonstrate the latter.

**70.** Strictly speaking, neither *Mendoza-Martinez* nor *Trop* involved a bill of attainder claim. However, in both cases, the issue was quite similar to such a claim; in *Mendoza-Martinez,* whether a statute which automatically imposes forfeiture of citizenship, without judicial or administrative proceedings, is penal in character and hence deprives individuals of citizenship rights without due process of law and other safeguards, 372 U.S. at 164, 83 S.Ct. 554; in *Trop,* whether denationalization may be inflicted as a punishment, 356 U.S. at 94, 78 S.Ct. 590. Both decisions relied in part upon bill of attainder precedents, and we find nothing in them to indicate that the nature of their determination of whether punishment was im-

*souri, supra*, 71 U.S. (4 Wall.) at 319–20, and in this case, as we have already noted, we find such alternative purposes plainly present. *See* pp. 349–354 *supra.* A similar test, and one whose application leads to the same conclusion, is that indicated in *Flemming v. Nestor, supra*, 363 U.S. at 614, 80 S.Ct. at 1374, *quoting De Veau v. Braisted, supra*, 363 U.S. at 160, 80 S.Ct. 1146 (plurality opinion):

> Where the source of legislative concern can be thought to be the activity or status from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected. The contrary is the case where the statute in question is evidently aimed at the person or class of persons disqualified.

> . . . . .

> "The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession."

There is no evidence presented to us, nor is there any to be found in the legislative record, to indicate that Congress' design was to impose a *penalty* upon *Mr. Nixon*, by depriving him of custody and control of the disposition of the materials at issue, as punishment for alleged *past* wrongdoings.[71] There is, however, ample evidence that Congress cared about *regulating* how the *materials* would be treated in *the future* in order to ensure that such treatment will be consistent with Congressional perceptions of the public interests. *See* pp. 348–354 *supra.*[72] Moreover, in determining whether depriving Mr. Nixon of absolute control of the materials constitutes punishment, other indicators— whether the deprivation has historically been regarded as punishment, whether it comes into effect only upon a finding of scienter, and whether the behavior to which it applies is already a crime, *Kennedy v. Mendoza-Martinez, supra*, 372 U.S. at 168, 83 S.Ct. 554; whether the deprivation seems especially severe in context, *id.* at 169, 83 S.Ct. 554; *Cummings v. Missouri, supra*, 71 U.S. (4 Wall.) at 317–18—also point toward a negative conclusion. Control over processing of presidential materials has not traditionally been associated with either crime or punishment, and the operation of the Act in no way depends on the scienter of Mr. Nixon or anyone else. Moreover, in relation to the congressional purposes, the Act could not have been drawn more narrowly, *see* p. 355 *supra*, and any effect on Mr. Nixon cannot be thought, in context, to be at all severe, or unnecessary, or merely punitive. The legislative history leads to only one conclusion, namely, that the Act before us is regulatory and not punitive in character.

That conclusion is reinforced by specific aspects of the Act that just do not square with the claim that the Act was a punitive measure. Section 102(b) of the Act gives Mr. Nixon as well as other individuals the right to contest any legal process directed to the materials by asserting any rights, defenses, or privileges he may have. Section 102(c) provides him or his designees with a right of access at all times to all materials covered

---

posed by legislative act differs from that determination in bill of attainder cases.

**71.** Congress may well have relied in part upon the allegations of wrongdoing by Mr. Nixon as a basis for treating him differently from other Presidents. As a theoretical matter, such reliance is equally consistent with (1) a desire to punish for past wrongdoing and (2) a desire to regulate the future treatment of the presidential materials. As a factual matter, such reliance appears from the legislative record to have been motivated by the second concern alone. *See* pp. 348–354 & note 69 *supra.*

**72.** That evidence, together with the ample basis for a congressional decision to treat Mr. Nixon somewhat differently from other presidents, *see* pp. 369–371 *supra*, suggests that the Act's singling out Mr. Nixon is of no special significance with respect to allegations that the Act constitutes punishment.

by the Act. Section 104(a) directs the Administrator, in promulgating regulations, to consider both the need to protect any party's opportunity to assert any legal or constitutional right or privilege (subsection 5), and the need to give to Mr. Nixon or his heirs, for his or their sole custody and use, any tape recordings or materials whose preservation is unnecessary to further legislative ends (subsection 7). Section 105(a) provides for jurisdiction and expedited treatment of various claims arising under the Act, and was designed in part to provide plaintiff with an expedited route to follow in seeking to protect any rights he believed had been infringed, 'see 120 Cong.Rec. S 18239 (daily ed. Oct. 3, 1974) (remarks of Sen. Ervin). Section 105(c) provides for payment of compensation to any individual who is found to have been deprived of private property by the operation of the Act. Provisions such as these are not the trappings of a punitive and vindicative enactment.[73] Finally the establishment in Title II of a Commission to study records of federal officials reflects Congress' perception of a genuine regulatory problem and the need for action to solve that problem in the future. Even if it could plausibly be alleged that a legislature whose design was to punish would choose as the penalty deprivation of control over these original materials—surely an odd form of punishment—it strains credulity to argue that the deprivation of control, in the context of and as limited by these specific statutory provisions, was intended to inflict punishment within the reach of the bill of attainder clause.

The approach of the Bicentennial Year has already seen a widening appreciation of the importance of the preservation of our historical heritage. It seems inevitable that Congress would sooner or later, address itself to the formulation of a uniform policy with respect to the disposition of the papers of presidents and other significant functionaries of the federal government.

Had the Act before us been fully prospective, it seems fair to say that none of the constitutional problems dealt with hereinabove would have been serious. Mr. Nixon, however, served as President for over five years in a highly eventful period, accumulating vastly more papers illuminative of his time in office than any other President. Moreover, his tenure of the office ended under extraordinary circumstances which have themselves become an important fact of our national history, and which brought sharply into focus the need for Congress to make a start upon the articulation of a coherent policy of records preservation. To start with Mr. Nixon himself was surely not an irrational determination, but it presents problems which both the face of the Act and its legislative history show Congress to have been keenly aware of.

We do not believe those problems to be such as to justify stopping the Act in its tracks, given its scheme of implementation by regulations in the writing of which Congress itself has retained a role. But sensitivity to constitutional protections cannot end with the adoption of the Act itself. It must permeate, in both regulation and practice, the effectuation of the Act as well.

■ Although we hold that the facial constitutionality of the Act requires dismissal of the complaint, we think it appropriate, pending the final disposition of any appeal plaintiff may deem it advisable to take, to enjoin any processing or disclosure of the materials in question except for the very limited purposes hereinafter appearing.

## ORDER

In accordance with the foregoing opinion, it is this 7th day of January, 1976,

Ordered that the preliminary and permanent injunctive relief prayed for by plaintiff is denied and the complaint dismissed as without merit; and, pending the final disposition of any appeal from this decision, it is

---

**73.** Indeed, the legislative record contains numerous references to the need to protect plaintiff's constitutional rights under the Act. See, e. g., S.Rep. No. 93–1181, 93d Cong., 2d Sess., at 2–3, 4–5, 5–6 (1974); pp. 24–25 supra.

Further ordered that the defendants, their superiors, agents, and assigns are hereby enjoined from processing, disclosing, inspecting, transferring, or otherwise disposing of any materials, be they documents, papers, tape recordings or other items, which might fall within the coverage of section 101(a), (b) of the Presidential Recordings and Materials Preservation Act and which are now or may in the future be in their custody, except as is specifically provided hereinafter; and it is

Further ordered that this injunction shall not bar production of materials pursuant to any subpoena or other lawful process in accordance with the procedures established in 41 C.F.R. §§ 105–63.201 to .207, .303; and it is

Further ordered that Mr. Nixon or his designated agent shall at all times have access to the materials in accordance with 41 C.F.R. §§ 105–63.201 to .207, .301, and shall have the right to obtain photographic reproductions of any documentary material; and it is

Further ordered that only the defendants or their agents shall undertake to reproduce any materials, and shall not permit any other person to do so; and it is

Further ordered that the injunction shall not bar inspection and photographic reproduction of documentary material when needed for current business of the executive branch of the federal government, pursuant to a request that has been approved by both the head of the agency or department of the executive branch seeking access and by defendant Philip W. Buchen or his successor, although plaintiff shall receive notice of any access requested ten days prior to the grant thereof in order to be able to raise in court any defenses, rights, or privileges that might bar such access, and if such opposition is presented, defendants shall not permit access until the issue has been resolved in court, and any such access granted shall be in accordance with the procedures of 41 C.F.R. §§ 105–63.201 to .207; and it is

Further ordered that this court will retain jurisdiction of this case in order to consider whatever additions, deletions, or changes in this order might be deemed appropriate.